STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. SYLVESTER JOHNSON, STANLEY CASSIDY AND WAYNE GODFREY, DEFENDANTS-APPELLANTS.

Argued December 21, 1959—Decided February 9, 1960.

490

See also 28 *N. J.* 133, 145 *A. 2d* 313.

492

*Mr. E. Stevenson Fluharty* argued the cause for the defendants-appellants.

*Mr. Norman Heine,* Camden County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Stephen M. Gretzkowski, Jr.,* on the brief).

The opinion of the court was delivered by

PROCTOR, J. The defendants Wayne Godfrey, Sylvester Johnson, and Stanley Cassidy were indicted by the Camden County grand jury for the murder of Edward Davis. Prior to the trial their motions for severance were denied. The State proceeded on the theory that the homicide was committed during an attempted robbery. The jury found the

defendants guilty of murder in the first degree without a recommendation of life imprisonment, and the court sentenced them to death. They appealed to this court as of right. *N. J. Const. Art.* VI, § V, *par.* 1(*c*); *R. R.* 1:2–1(*c*).

Shortly after 6:00 P. M. on Friday, January 24, 1958, Edward Davis, who owned and operated a toy store just off the northwest corner of Broadway and Ferry Avenue in Camden, came running out of his store bleeding profusely, calling for help, and exclaiming "I am shot." He collapsed to the sidewalk. The police were immediately notified, and, within a few minutes, rushed Davis to the hospital. About thirty-five minutes after entering the hospital, Davis died.

Subsequent medical examinations revealed that there were seven bullet holes on Davis' body, and the examiners concluded he had been shot four times. There were no powder burns. Two of the bullets passed through his face and a third lodged in his neck. The fourth bullet entered the left groin just below the belt, passed upward through the liver and right lung, emerging somewhat above the shoulder blade. Dr. Louis Reigert, who performed the autopsy, testified that death resulted from hemorrhage caused by the perforation of the liver and right lung.

At the trial Josephine Iwanuk testified that she lived on Jasper Street, just around the corner from Davis' store. Jasper Street meets Broadway and Ferry Avenue at a common intersection. A church is located in the angle formed by Jasper Street and Ferry Avenue, almost directly across Jasper Street from Miss Iwanuk's house. Around 6:00 P. M. on the date of Davis' death, while entering her car, Miss Iwanuk noticed "two colored boys on the opposite side of the street walking toward Broadway." She also noticed a two-tone car with three round vents in its front fender parked on the side of the street on which the boys were walking. She then drove down Jasper Street past the parked car. She could not further identify either the boys or the car.

Arthur Ognissanti, a motorist who had stopped his car for a red traffic signal at the intersection of Fourth Street

and Ferry Avenue at about 6:00 P. M. that day, testified that he noticed an automobile with two occupants swing around him, pass through the red light and turn into Ferry Avenue. (Ferry Avenue and Fourth Street intersect about one block from Davis' store and about a block and a half from Miss Iwanuk's house.) The automobile continued on Ferry Avenue, stopped momentarily, and started up again. Because of the traffic violation, Ognissanti noticed its license number, CE 4472. A day or so later, after hearing about "some excitement" in the neighborhood, Ognissanti gave the police this information. At the trial, he identified Godfrey's automobile from photographs as the car he had seen.

The police checked the license number and learned the automobile was registered in the name of the defendant Wayne Godfrey. They took Godfrey and a companion, Noah Hamilton, into custody on Tuesday afternoon, January 28, 1958. At that time Godfrey acknowledged ownership of the vehicle. At 4:00 o'clock the following morning, the defendant Cassidy was arrested, and the defendant Johnson was apprehended in Newark late that afternoon.

All three of the defendants confessed that on Friday, January 24, 1958, they attempted to rob Edward Davis' toy store, and that during the attempt, Johnson shot Davis. At the trial, the confessions were read into evidence. Since one of the issues raised on this appeal is whether the confessions were properly admitted, we will set them out in some detail. Cassidy gave three statements to Wilfred Dube, Chief of Detectives in the Camden County Prosecutor's office, and Godfrey gave two. In his initial statement, Cassidy said that around 6:00 P. M. on January 24 Johnson and Godfrey came to his home, and that they all took a ride in Godfrey's car, a 1956 or 1957 two-tone brown and cream-colored Buick. He was told "they were going to get some money." As they were driving past Davis' toy store, Cassidy was told "there is an old man, and all you have to do is grab him and take the money off him," and that "all I had to do was walk in first and Sylvester [Johnson] was to come in back of the

man and grab and take the money from him." Godfrey parked the car near a church on the first block past Ferry Avenue. Johnson and Cassidy walked to the toy store, inquired about some electric trains and looked at some toy trucks. They left and walked back to the corner where Johnson said that they should return to the store and that he would "grab" Davis. On their second visit, Cassidy walked toward the rear of the store, and Davis followed him. They had reached about the middle of the store when Cassidy heard Johnson, who was behind Davis, say "this is it," and hearing a shot he turned around and saw Davis reaching for Johnson. Three or four more shots followed. Cassidy said he was not armed and, until this point, he did not know that Johnson had a gun. He thought "it was just supposed to be a strong-arm job." Davis ran to the front of the store "and started to holler." Johnson ran by Cassidy and out the back door, and Cassidy followed him. Cassidy entered the car where Godfrey was waiting. They drove off and shortly thereafter picked up Johnson on Second Street or Ferry Avenue. Cassidy thought that Johnson had cut one of his hands, as it had blood on it. After leaving Godfrey's car and changing his clothes at home, Cassidy stopped at a bar, and soon thereafter picked up his girl friend and went to a night club in Philadelphia. Returning to Camden about midnight, they visited another bar before going home. On Saturday, the next day, Godfrey told Cassidy that Davis had died. Later in the day, Cassidy saw Noah Hamilton and told him about the holdup.

In his second statement, Cassidy somewhat altered his account of the crime and said that it was at his house, rather than in the car, that the decision to rob Davis' store was made. He also admitted, contrary to his prior statement, that during the holdup he carried in his pocket a .25 calibre black automatic which he had been "holding" for a friend, Robert Brinn, and which he returned to Brinn within two hours after the holdup.

In his third statement, Cassidy added to his prior statements. He said that on the night before the crime Godfrey had given him another gun "to hold," a nickel-plated .32 calibre revolver, which Cassidy identified as the murder weapon. He stated that he gave the revolver back to Godfrey just before the three men left his house to rob the toy store, but kept the .25 calibre automatic.

Godfrey, in his first statement, said that he owned a 1957 Buick Special automobile, which carried the license number noted by Ognissanti.. On the afternoon of the holdup he went to Cassidy's house where he discussed a possible robbery with Johnson and Cassidy. The latter two said they needed some money, and each of them had a gun. Johnson's gun was a revolver, probably a ".32." Cassidy's was smaller; it was blue and looked like an automatic. Godfrey drove the other two men down Broadway, where they had decided to rob the toy store. Godfrey turned into Jasper Street, the first block beyond Ferry Avenue, and parked near a church. After Cassidy and Johnson left for the store, Godfrey saw a car parked on the opposite side of the street, and noticed that as the car started and passed him the occupant or occupants looked at him. After ten minutes, Cassidy and Johnson returned, and Johnson said that he had been looking at a toy truck and had put his fingerprints on it. Johnson and Cassidy again left for the store. About eight minutes later, Cassidy returned to the car and told Godfrey that Johnson had shot the proprietor. Godfrey and Cassidy drove to Fourth Street and turned into Ferry Avenue, where they saw Johnson. Godfrey stopped, and Johnson got into the car and told him what had happened. Johnson's hand was bleeding and had something wrapped around it. After dropping the other two men, Godfrey returned home. Later, after stopping at the Little Click bar, he visited Noah Hamilton at the latter's home and they returned to the bar. Around midnight, Godfrey and Hamilton left to meet Godfrey's wife at her place of employment. They picked her up and left her at a party. They then

returned to the Little Click, where they drank until 2:00 A. M. After taking Hamilton home, Godfrey returned to his own house. During the evening he told Hamilton the details of the robbery.

The following day, Saturday, at Johnson's request, Godfrey drove to Newark with Cassidy, Johnson and Hamilton. They stopped at Godfrey's aunt's house and drank for a while. Later Godfrey drove Johnson to another house in the vicinity, and left him there and returned to his aunt's house; where he rejoined Cassidy and Hamilton.

In his second statement, Godfrey somewhat changed his earlier version and admitted he had borrowed the .32 calibre revolver used by Johnson from James Walker on the day before the crime. He said he told Walker he needed the gun for protection and "would give it back to him tomorrow [Friday]." Godfrey gave the weapon and five shells to Cassidy, who kept them overnight. The following day Cassidy asked Johnson whether he would like to carry the .25 or the .32. Johnson chose "the nickel-plated one, the .32." After the holdup, Godfrey returned the .32, now empty of bullets, to Walker that same evening. He also gave Walker five .32 calibre bullets to replace those which had been spent. He had seven or eight boxes of such ammunition in his house.

Johnson was apprehended at his uncle's house in Newark late in the afternoon of Wednesday, January 29, 1958. He was returned to Camden and made his statement to Chief Dube early the following morning. He said that late in the afternoon of the day of the crime the three men talked at Cassidy's house about their need for money, and the discussion turned to the prospect of robbing some one. At Godfrey's suggestion, they decided to rob a toy store on Broadway near Ferry Avenue, as only one man operated it. Godfrey was to drive, and Cassidy and Johnson were to enter the shop. Godfrey gave Johnson a .32 calibre nickel-plated revolver; Cassidy was also armed.

Godfrey drove past the toy store and parked the car near a church off Broadway on the first street beyond Ferry

Avenue. Johnson and Cassidy walked to the store and entered by the front door. After asking the proprietor to show them some toys, Johnson picked up a toy truck, a model of a cement mixer. He realized he had touched the truck, and he and Cassidy left and returned to Godfrey's car. There, they decided to "rob the place and take the truck with us" and "hold the man up." Johnson and Cassidy went back to the store. Cassidy was asking the proprietor about the toy truck in the rear of the store, when Johnson "pulled out the revolver and told him it was a stickup." Davis grabbed for Johnson, "tussled," and "the gun went off, and when the gun went off I didn't know what happened, I was scared, and I was just shooting." He did not recall how many shots he fired, or whether he hit the man. He said, "I was trying to scare him." He ran out the back door and down Ferry Avenue about a block and a half, when Godfrey and Cassidy drove by and picked him up. Either during the struggle with Davis or in his rush to escape, Johnson cut the middle finger of his left hand. After leaving Godfrey's car he went to his sister's house, where he remained until the next day.

On Saturday, the following day, Johnson met Godfrey, Cassidy and Noah Hamilton and persuaded them to drive to Newark. His reason for visiting Newark was to get a job and to get away from Camden for a while. After they reached Newark, they stopped at Godfrey's aunt's house and later Godfrey drove Johnson to the house of the latter's uncle. He stayed there until apprehended by the police.

In addition to the confessions and the proofs of Davis' death and its cause, the State also introduced the following evidence:

The .32 calibre revolver identified by the defendants in their confessions was established to be the murder weapon. August Hoppe, in charge of the State Police Firearms Identification Laboratory, was called to give the results of the tests confirming that fact. But before he gave such testimony, it was stipulated that Davis was killed by bullets fired from the revolver identified by the defendants.

The State also presented evidence to show that both the murder weapon and the .25 calibre automatic that Cassidy said he carried were in the defendants' possession around the time of the crime and were returned to their owners that evening. James Walker testified that Godfrey came to his house on the evening before the holdup and borrowed his nickel-plated .32 calibre revolver containing five bullets, and that Godfrey said some "fellows" were bothering him and he wanted to use the gun for protection. Godfrey returned the gun, which was loaded, about 7:00 o'clock on the night of the holdup. Walker then turned the gun over to a friend, Leon Ashley, who kept it for him. The police recovered the gun from Ashley. Robert Brinn testified that a few days before the holdup he gave his loaded .25 calibre automatic to Cassidy because he needed a hiding place for the weapon from his mother. Cassidy returned the gun to him still loaded around 7:00 or 8:00 o'clock on the night of the crime. Brinn told the police where the gun might be found and it was later recovered.

A plan of the interior of the toy store was put in evidence, showing a rear door leading to Ferry Avenue. There was also proof that shortly after the holdup the interior of the shop was found to be disarranged, and "various cases of materials were thrown all over the place." Blood of the same type as Davis' was found on a number of articles between the middle and the front of the store. Blood of the same type was also found on the sidewalk where Davis collapsed. It was established by expert testimony that Johnson's fingerprint was on a toy model of a cement truck on display in the shop.

Noah Hamilton testified that he met Godfrey at the Little Click bar at 9:00 or 10:00 o'clock on the evening of January 24, 1958. At about midnight they left and picked up Godfrey's wife at her place of employment. They drove her home and returned to the Little Click. Around 1:30 A. M. they went to a party and later went home. Hamilton further testified that while he and Godfrey were waiting for the

latter's wife, he bought a newspaper at Godfrey's request. Godfrey asked him to look in the paper for news of a holdup and a shooting. Hamilton testified as follows:

"A. I told him there was no holdup in the papers with a shooting. The only holdup was with a shotgun.

Q. What did he say, if anything, to that remark by you? A. He said that was not him.

Q. Did he say anything else? A. He asked me where was it at.

Q. What did you tell him? A. On Broadway.

Q. Whereabouts on Broadway? A. Broadway and Ferry Avenue.

Q. What did he say to that? A. He said that was it."

Hamilton further testified that Godfrey told him that he had been in the holdup but had not done the shooting.

Hamilton also testified that on the following afternoon, Saturday, he drove with Godfrey, Cassidy and Johnson, in Godfrey's car, to Newark; that they stopped at Godfrey's aunt's house, and that Johnson was taken to his uncle's house and left there. Hamilton noticed a bandage on Johnson's finger, and asked him how he felt. Johnson said he did not want to talk about it, but later told Hamilton that he hurt his finger "tussling" with the proprietor in the toy store. Finally, Hamilton testified that six or eight weeks before the holdup, Godfrey asked him to help rob a toy store on Broadway and "make some money." Hamilton refused.

At the end of the State's case all the defendants moved for judgments of acquittal, on two grounds, (1) that the State had failed to prove the *corpus delicti* of the attempted robbery independent of the confessions, and (2) that each defendant was prejudiced by statements contained in the confessions of the others. The motions were denied and the defendants rested without taking the stand or offering any evidence in their own behalf. After the summations and the court's charge the jury retired and about four and a half hours later returned a verdict finding the defendants guilty of murder in the first degree without recommendation of life imprisonment.

The grounds urged by the defendants for reversal of their convictions are (1) that the confessions should not have been admitted into evidence because there was no independent proof of the crime of attempted robbery, (2) that apart from the confessions there was insufficient evidence to convict, and therefore the court erred in denying the motions for acquittal, (3) that each of the defendants was denied a fair trial by the court's refusal to grant a severance, (4) that the failure of the State to offer evidence to the jury of the manner in which the confessions were obtained denied the defendants their right to a trial by jury. After the briefs were filed, this court suggested that counsel also brief and argue the question whether the prosecutor made improper and prejudicial statements during his summation.

The defendants first argue that there was no proof independent of the confessions that the defendants were engaged in an attempted robbery at the time of the killing, and that in the absence of such proof, their confessions were inadmissible. They contend that, as the State chose to proceed upon the theory of felony-murder, the State was obligated to prove the attempt to commit a robbery through evidence other than the statements of the defendants themselves.

■ This court recently affirmed a conviction for felony-murder where deaths resulted from arson, and where a confession of the defendant was at the core of the State's case. In our opinion in that case we declared that in order to rely upon a confession the State

"* * * must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury, * * *." *State v. Lucas*, 30 *N. J.* 37, at *page* 56 (1959).

See also *State v. Guild*, 10 *N. J. L.* 163 (*Sup. Ct.* 1828).

■ The reason for the rule requiring evidence independent of the confession and corroborating it is to avoid the danger of convicting a defendant solely out of his own mouth of a crime that never occurred or a crime committed by some-

one else. See *State v. Lucas, supra,* 30 *N. J.,* at *page* 57; *State v. Geltzeiler,* 101 *N. J. L.* 415, at *page* 416 (*E. & A.* 1925); 7 *Wigmore, Evidence,* § 2072 (3*d ed.* 1940). Thus, in order to use a confession in a felony-murder prosecution it is enough that the State prove that a death occurred, and introduce independent corroborative evidence tending to establish that when the defendant confessed he was telling the truth. We are satisfied that the State met this requirement.

█ The fact of Davis' death was proved through the testimony of Leroy Wooster, Camden County Coroner, Dr. Louis Reigert, who performed the autopsy, and Davis' nephew, who identified the body.

All the confessions were corroborated by the testimony of Miss Iwanuk and Mr. Ognissanti, which tended to show that Godfrey's car and the three defendants were in the vicinity of the Davis store around the time of the shooting. Moreover, Mr. Ognissanti's testimony tended to show that the occupants of Godfrey's car were in a hurry to leave the area. The trustworthiness of the confessions was also strengthened by the fact that in them the defendants accurately described the toy store, the location of the church, and the surrounding neighborhood. The confessions of Cassidy and Johnson were further bolstered by the State's expert proof of the violent manner of Davis' death.

Each confession was corroborated by additional testimony presented by the State. Cassidy confessed that the shooting took place in the middle of the store and that the victim ran, shouting, to the front. In corroboration, the State proved that blood of Davis' type was found extending from that part of the store to the front and onto the sidewalk, and that Davis was heard calling for help and crying "I am shot." Cassidy admitted he was carrying a .25 calibre automatic, which he said he obtained from Robert Brinn a few days earlier and which he returned to Brinn shortly after the crime. Brinn's testimony substantiated this part of the confession. Cassidy also stated that Johnson had cut one of his hands in the toy store. The State independently

proved through Noah Hamilton that on the day following the holdup Johnson had a bandage on his hand.

Godfrey confessed he secured the murder weapon, a .32 calibre nickel-plated revolver, on the night before the crime and returned it to James Walker at the Little Click bar a few hours after the crime. These facts were confirmed by Walker. Moreover, the automobile whose ownership Godfrey admitted was independently proved to have been near the toy store around the time of the crime.

Johnson, in his confession, said that while in the store he picked up a toy model of a cement mixer. The State proved that his fingerprint was found on such a model in the store. Johnson also confessed that he cut his finger during the holdup. As mentioned earlier, this fact was corroborated by the testimony of Noah Hamilton. He also confessed that he shot Davis with the .32 calibre nickel-plated revolver that was established to have been the murder weapon. He further confessed that the day following the holdup, he went to his uncle's house in Newark, where, it was independently proved, he was arrested.

We need not consider whether the extra-judicial admissions testified to by Noah Hamilton may be used as corroboration of the confessions. See *United States v. Calderon,* 348 *U. S.* 160, 75 *S. Ct.* 186, 99 *L. Ed.* 202 (1954). Of course, those statements may have probative value of their own, and their admissibility on that score is not questioned. It is also clear that admissions and confessions made by each defendant may not be used to corroborate the admissions and confessions of the others. Each defendant may bind only himself by his own words.

The State was not required to prove, independently of the defendants' confessions, the fact that the shooting occurred during the commission of a felony. Of the three elements of murder, *i. e.,* death, criminal agency and the connection of the defendants therewith, the State need independently prove only the first. It may rely on the corroborated words of the defendants to prove the others. *State v.*

*Lucas, supra; Wigmore, loc. cit. supra.* In a prosecution for felony-murder, proof of the felony replaces proof of the mental elements necessary for conviction of willful, deliberate and premeditated killing. In a prosecution for premeditated murder, the State is not required independently to prove those mental elements if the defendant has given a confession that admits them. By the same token, independent proof of the felony in a felony-murder prosecution is not necessary if proof of the felony can be gathered from a corroborated confession. In our view the State satisfied the burden placed upon it by independently proving the fact of death, and by producing corroborative evidence tending to establish that when the defendants confessed that they participated in the holdup and killing they were telling the truth. We therefore find that the confessions were properly received in evidence and were amply corroborated.

█ Our conclusion on this point also disposes of the defendants' second point, *i. e.,* that their motions for acquittal should have been granted for the reason that if the confessions were inadmissible there was insufficient evidence to convict.

█ The defendants' third point is that they were each deprived of a fair trial by the denial of their motions for severance. They argue that the confession of each defendant contained statements inculpating the others that were not admissible against them, and that the jury could not fairly have been expected to properly limit the effect of those statements. *R. R.* 3 :5–7 provides that if a defendant is prejudiced by joinder for trial together with other defendants, the trial court may, in its discretion, order a severance. The rule is declaratory of a practice of long standing in this and almost every other state. *State v. Rios,* 17 *N. J.* 572 (1955).

In the *Rios* case, four defendants to an indictment for felony-murder were tried together. The crime was like the one charged in the present case. The four defendants decided to rob a luncheonette. Rios and another of the defendants

entered the premises while the other two remained outside. During the robbery Rios killed the proprietor. After their apprehension by the police some of the defendants confessed, and in confessing each defendant implicated the others. Rios, who confessed to the actual shooting, moved for severance of his trial on the ground that he would be prejudiced by the statements and confessions of the other defendants as they would seek to magnify his culpability while minimizing their participation in the crime. One of the defendants who did not enter the luncheonette moved for severance on the ground that the confession of Rios implicated him in the crime and thus cast the actual killer's guilt on him. A severance, argued both defendants, would prevent the use of the confession of one in the trial of the other, and thus avoid the danger that the jury would use the confession of one as evidence of the other's participation in the crime.

This court noted (1) that the confessions were not in dispute as to the essential facts of the crime, such as would have been the case if each defendant had insisted that another had done the shooting, (2) that separate trials would have created almost insurmountable problems of administration, and (3) that the trial judge gave instructions to the jury on nine occasions that the confession of one defendant was not binding on the others and that the effect of the confessions should be so limited. In those circumstances, this court was satisfied that the trial judge did not abuse his discretion in denying the motions for severance. See also *State v. Manney,* 26 *N. J.* 362 (1958); *State v. Rosenberg,* 37 *N. J. Super.* 197 (*App. Div.* 1955).

In the present case, all the defendants confessed, and the confessions were also in substantial agreement. Not one exhibits an effort to place the *onus* of the crime on the shoulders of the other defendants. They all agree on who did the shooting. The only discrepancy is on the question whose mind it was that originated the idea of robbing Davis' toy store. Separate trials for each defendant would have meant the three-fold production and repetition of all the testimony of numerous doctors, law enforcement officers and

other witnesses. And also, on seven distinct occasions, during the trial and in his charge, the trial judge gave specific cautionary instructions to the jury on the limited effect to be given the confessions. We conclude that in these circumstances the trial judge did not abuse his discretion in refusing to grant a severance.

The fourth ground urged for reversal is that the failure of the State to offer evidence to the jury of the manner in which the defendants' confessions were obtained denied them their right to a trial by jury. Before the confessions were read to the jury, the trial judge conducted a hearing to determine whether the confessions were voluntary. At the request of the defendants the hearing was conducted out of the presence of the jury. Chief Dube, three other officers and a shorthand reporter, all of whom were present when the defendants confessed, testified. The defendants declined to offer any evidence at this hearing on their own behalf. After the trial judge found all of the confessions voluntary and therefore admissible, the prosecutor said he assumed that the testimony given at the hearing on admissibility would be reintroduced in the presence of the jury. All three counsel for the defendants announced that they were "satisfied not to go through it again," and agreed that the confessions be read to the jury without any testimony at all on the issue of voluntariness.

The defendants now argue that as a result of the procedure adopted at the trial, the jury were prevented from hearing all of the facts in the case, and that defendants' election to omit relevant and significant testimony violated their right to have the jury hear all the facts. Additionally, the defendants point to *N. J. S.* 2*A* :113–4, which provides that the penalty for first degree murder shall be death, unless the jury shall "upon and after the consideration of all the evidence, recommend life imprisonment * * *." They argue that the jury could not fairly make a choice between the death penalty and life imprisonment, because they were not permitted to consider all the evidence, including the circumstances under which the confessions were made.

The State assumed the burden of proving the voluntariness of the confessions; it was not suggested at the trial or before us that they were involuntary. What the defendants contend is that in a capital case they are not permitted to make the tactical choice to waive proof of voluntariness before the jury after such proof has been made before the trial judge. In *State v. Yarrow*, 104 *N. J. L.* 512 (1928) the Court of Errors and Appeals had before it much the same problem. That was a murder case in which the State sought to introduce a confession of the defendant. The hearing on the voluntariness of the confession was, on application of defendant's counsel, conducted out of the presence of the jury. The trial judge ruled the confession admissible. Then the jury were returned, and the confession was read to them by the stenographer who took it. The defendant did not offer any proof before the jury relating to the confession except by cross-examination of the stenographer. On the defendant's appeal from his conviction, the court affirmed, holding that in order to raise the question of the weight to be given the confession by the jury, it was necessary for the defendant to offer evidence before them on that subject. We need not consider in the circumstances of the case before us what affirmative move the defendants would have been required to make in order to have the jury consider that question. It is clear, however, that where, as here, the defendants expressly decline to have the testimony on voluntariness repeated to the jury, they cannot be heard to challenge their convictions on the ground that they were deprived of the right to have the jury hear all of the evidence.

*N. J. S.* 2A:113-4 does not affect this conclusion. That provision merely states that it is upon all the evidence brought before them that the jury are to decide whether to recommend life imprisonment in a capital case. There is no suggestion in the provision that the jury's decision is open to attack on the ground that the defendants themselves failed to produce relevant matter for their consideration. The State was prepared and willing to repeat before the jury its

proof of the voluntariness of the defendants' confessions. It was only at the instance of the defendants that such proof was omitted. It might well be to the advantage of the defendants in some cases to have omitted from the State's case uncontroverted evidence that their confessions were freely made, because such evidence might over-emphasize the trustworthiness of the confessions in the minds of the jury. If the defendants for any reason wish to have such evidence omitted, we see no grounds for denying them that choice. But once having made the choice, they cannot later complain that they were deprived by it of a trial by jury on all the evidence.

The defendants' final point, raised in their supplemental brief, is that they were denied a fair trial because of the improper and prejudicial remarks of the prosecutor during his summation.

 In their summations, each of the defense counsel conceded that the defendants were guilty of murder in the first degree. The summations were devoted to pleas for life imprisonment rather than the death sentence. Their arguments for mercy were based primarily on the premises that the killing was unintentional and unforeseen; that this was not the kind of case that called for the extreme penalty; that capital punishment in any case was harsh, unjust, and did not deter crime; and that the defendants were sorry for what they had done. The prosecutor answered these pleas in a forceful style. It was during his answering summation that the remarks now complained of were made.

At the trial objection was made to only one of the remarks, i. e., the prosecutor's reference to the defendants as "callously indifferent to all that went on" at the trial, and the trial judge overruled the objection. This remark was directed to the vigorous arguments for mercy, including a statement by one of defense counsel that he had known his client for some time and "always knew [him] to be a good boy," a reference by another defense counsel to his client as a youth whose mind was subject to "the maneuverings of others," and particularly to an invitation by the third defense counsel

that the jury consider the repentant attitude shown by his client in the courtroom. In the circumstances, we do not think it was prejudicial to the defendants for the prosecutor to make a similar invitation and to suggest that the jury might draw a different conclusion. This is particularly so as the trial judge emphatically charged the jury that they must render their verdict solely on the evidence, and must disregard any comment made by court or counsel that did not completely coincide with their recollection of the evidence. We need not consider whether as a general rule a prosecutor may refer to the attitude exhibited in the courtroom by a defendant who has not taken the stand to testify.

As to the other remarks now challenged as improper, no objection was made at the trial. And as said above, we raised this question on our own motion. Thus it is only under the plain error rule, *R. R.* 1:5-1, that we may consider them. Our examination, therefore, is limited to the question whether the remarks, if improper, substantially prejudiced the defendants' fundamental right to have the jury fairly evaluate the merits of their defense, and thus had a clear capacity to bring about an unjust result. *State v. Bucanis,* 26 *N. J.* 45, at *page* 56 (1958); *State v. Corby,* 28 *N. J.* 106, at *page* 108 (1958).

Generally a prosecutor, in his summation, may discuss only the facts shown or reasonably suggested by the evidence. *State v. Bogen,* 13 *N. J.* 137, at *page* 140 (1953). But so long as he confines himself to the facts and reasonable inferences, what he says in discussing them, by way of comment, denunciation or appeal, will afford no ground for reversal. *State v. Lang,* 75 *N. J. L.* 1 *(Sup. Ct.),* affirmed 75 *N. J. L.* 502 *(E. & A.* 1907), affirmed 209 *U. S.* 467, 28 *S. Ct.* 594, 52 *L. Ed.* 894 (1908). See *People v. Fielding,* 158 *N. Y.* 542, 53 *N. E.* 497 *(Ct. App.* 1899). The prosecutor is entitled to sum up the State's case graphically and forcefully. It is unreasonable to expect that criminal trials will be conducted without some show of feeling. Defense counsel traditionally make dramatic appeals to the emotions of the jury. In these circumstances, a

prosecutor cannot be expected to present the State's case in a manner appropriate to a lecture hall. See *United States v. Wexler,* 79 *F. 2d* 526 (2 *Cir.* 1935), *certiorari* denied 297 *U. S.* 703, 56 *S. Ct.* 384, 80 *L. Ed.* 991 (1936). The prosecutor, however, does represent the government and people of the State, and it is fair to say that the members of the jury have confidence that he will fairly fulfill his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent. Thus, his comments in summation whether proper or improper carry with them the authority of all he represents. See *Berger v. United States,* 295 *U. S.* 78, 55 *S. Ct.* 629, 79 *L. Ed.* 1314 (1935). We have not hesitated to reverse convictions where we have found that the prosecutor in his summation overstepped the bounds of propriety and created a real danger of prejudice to the accused. See *State v. D'Ippolito,* 19 *N. J.* 540 (1955); *State v. Siciliano,* 21 *N. J.* 249 (1956); *State v. Welsch,* 29 *N. J.* 152 (1959). And this is particularly so when a life is at stake. See *State v. Mount,* 30 *N. J.* 195, at *page* 213 (1959). However, we have held that not every departure from the facts and reasonable inferences necessarily calls for a reversal, and "on the question whether the improper comment shall have that effect, the making by trial counsel of a timely and proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations." *State v. Vaszorich,* 13 *N. J.* 99, at *page* 119 (1953). A timely objection gives the trial court and the prosecutor an opportunity to counteract the effect of any unseemly remark. In many cases the possibly prejudicial impact of the prosecutor's remarks can be eliminated by such corrective action. *State v. Bucanis, supra.* Additionally, an appellate court, limited in its review to the printed record, may infer from counsel's failure to object to the remarks at the time they were made that he did not in the atmosphere of the trial think them out of bounds.

In his summation, the prosecutor described the crime and the roles taken by the defendants in it. He characterized the defendants collectively as killers, robbers, strong-arm

men, and gunmen, and described individual defendants as "triggerman," "ring leader," "conniving fingerman," and the like. We can see nothing in these words that violated the defendants' rights. There was no suggestion by the defendants that the account of the crime contained in the confessions was inaccurate. The prosecutor's description may have been graphic, but it was not unjustified by the evidence. *State v. Cioffe,* 128 *N. J. L.* 342 (*Sup. Ct.* 1942), affirmed *per curiam* 130 *N. J. L.* 160 (*E. & A.* 1943); *State v. Lang, supra. Cf. State v. Siciliano, supra.*

The question that particularly disturbed us was whether the prosecutor could have been understood by the jury to have intimated in another comment that he had evidence of other criminal activity by the defendants. Before us the prosecutor disclaimed any such purpose and none of the defense counsel or presumably the trial court found that meaning. We disapprove of a line of comment that might give the jury that impression. But upon full consideration we are satisfied it did not communicate to the jury the possible implication to which we have referred, especially in view of the court's emphatic charge that the jury consider only their recollection of the evidence brought before them.

The prosecutor also commented, without objection, that the defendants "didn't dare take the stand" and say they were sorry. The defendants' failure to testify could properly evoke comment by the prosecutor on their inability to deny testimony about facts within their knowledge, and the trial court instructed the jury that they could consider it only on that score. But the prosecutor suggested that the jury might consider the defendants' failure to testify in a broader context. However, in view of the trial court's clear instruction that the defendants' failure to testify should not be considered by the jury in their determination whether to recommend life imprisonment—the only real issue before the jury—we are satisfied that the remark did not prejudice the substantial rights of the defendants.

Finally, the prosecutor argued, without objection, that the jury might be guilty of violating their oaths if they

did not impose the death sentence, and commented that it was not the jury but the law that would sentence the defendants to death. We do not approve of this kind of argument. See *State v. Mount, supra,* 30 *N. J.,* at *page* 213. But in the circumstances of this case, we are confident that it did no harm. In other parts of his summation, the prosecutor reminded the jury on six separate occasions that under the law they had the discretion to recommend life imprisonment rather than death. The defense counsel conducted their lengthy summations squarely on that premise. In his charge, the trial judge fully and accurately instructed the jury that it was solely within their judgment whether to recommend life imprisonment, and on three other occasions made specific reference to their discretion. Particular remarks must be appraised in the setting of the whole trial. The possible harm of the remarks now challenged was completely overcome by the accurate statements of the law in the balance of the prosecutor's summation and the court's charge. *Cf. State v. Buffa,* 31 *N. J.* 378 (1960).

We are mindful that the question is not the impact of the prosecutor's remarks upon the issue of guilt, but rather upon the delicate subject of punishment. Nonetheless, after a careful examination of the record of the trial and all of the challenged remarks in their trial setting, and taking into account the trial judge's complete and accurate charge, and the fact that except for one instance none of the prosecutor's remarks impressed counsel for the defense as improper in the setting and atmosphere of the trial, we are completely satisfied that the defendants' right to a full and fair hearing was not denied by the conduct of the prosecutor.

We find no error in the judgments below, and they are accordingly affirmed as to each defendant.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.