**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3189-18T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHNELL MCCOY, a/k/a
JOHNELL WILLIAMS, III,
and JOHNELL MCCOY, JR.,

     Defendant-Appellant.

_____

Submitted November 5, 2020 – Decided November 24, 2020

Before Judges Ostrer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-02-0115.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel V. Gautieri, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Stephen C. Sayer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

For about a month, police surveilled defendant Johnell McCoy while he visited his mother's Vineland home. Then, pursuant to a warrant, they searched the home and seized cocaine, drug packaging, a scale, and cash from one room, and a handgun from a closet. They also arrested McCoy, alleging that the drugs, gun and money all belonged to him.

After a trial, a jury found McCoy guilty of possession of a controlled dangerous substance (CDS), cocaine, N.J.S.A. 2C:35–10(a)(1), and of doing so with the intent to distribute, N.J.S.A. 2C:35–5(b)(3) — both third-degree crimes. The jury acquitted McCoy of possession of a weapon while committing a CDS offense, N.J.S.A. 2C:39–4.1(a), a second-degree crime. The court then imposed an extended term of five years, with a two-and-a-half-year period of parole ineligibility.

On appeal, McCoy contends that three errors, singly or cumulatively, denied him a fair trial. First, he complains that the jury heard testimony from which it could infer that, before arresting McCoy, police obtained drugs from the Vineland home three times. The judge promised to instruct the jury to disregard that testimony, but he never actually gave the instruction. Second, the prosecutor stated in summation — contrary to the record — that people visited

McCoy at the home at all hours of the night.  This misstatement was especially prejudicial because it dovetailed with a State expert's opinion that such visits typically occur where drugs are sold.  Third, McCoy contends that the court should have delivered the "mere presence" section of the model jury instruction on possession.

We agree that the first two errors, together if not singly, were clearly capable of producing an unjust result.  See R. 2:10–2.  When viewed in light of the record as a whole, those errors evidently convinced the jury that much more drug activity occurred at the Vineland home than the State proved by admissible evidence.  Therefore, we reverse.

The State's case was circumstantial.  No one testified to seeing McCoy selling, or even possessing, drugs.  No forensic evidence tied McCoy's DNA or fingerprints to any of the items police seized.

New Jersey State Trooper Michael Cresci, the lead investigator, testified that he observed the Vineland home more than twenty times during the roughly month-long surveillance period.  He did so at various times of day, for up to forty-five minutes at a time.  McCoy was the only person he observed outside the home; the trooper never saw anyone else with McCoy.  He evidently did not see McCoy's mother, who lived there and parked her car there, but who worked

long hours. He often saw McCoy playing with two pit bulls, and he once saw McCoy remove a duffle bag from his car.

The State did not contend that McCoy lived at his mother's home. McCoy's mother testified that he often visited to help with the dogs while she was at work. She said that he occasionally slept over, probably staying in the living room. The mother of one of McCoy's children testified that McCoy lived with her before his arrest. She also owned the car McCoy drove to and from the Vineland home.

McCoy's mother testified that McCoy was not the only family member who stayed in her home. Others — including her adult nephew and McCoy's adult brother — also visited. Her adult nephew stayed in the living room when he visited, and McCoy's adult brother had access to every room in the home. An adult granddaughter, who had moved out a few weeks before the search and seizure, had also stayed in the living room.

McCoy's mother testified that she never saw McCoy with a gun nor was she aware of any drugs in her home. McCoy's paramour testified that she never saw McCoy with drugs or a gun. However, McCoy was the only person present in the home when the drugs and gun were seized. Police found the drugs, $1600 in cash, and small plastic bags in a closed but clear plastic Tupperware container

4

in the living room of the two-bedroom apartment. They also found a scale in the apartment, and additional cash in the car McCoy drove.

To persuade the jury that McCoy possessed the drugs, and that he did so with intent to distribute, the State called a police drug expert. He testified that, in conducting their business, drug dealers often possess guard dogs, guns, scales, plastic bags, and substantial amounts of cash — all things police observed or seized.

However, the expert also confirmed that a "high volume of foot traffic . . . coming into a specific residence would be indicative of drug sales" — but no one testified to seeing a high volume of foot traffic at the Vineland home. The expert explained that, if drug sales were occurring at a house, police might see a visitor who did not "live at that house or have any reason to even be at that house," and that "anything from seconds to minutes later," the visitor would leave. He added that "that would happen numerous different times a day with different individuals."

The State's laboratory expert, called to establish that the substance seized from the home was in fact cocaine, indicated that drugs originated from the home on three prior occasions and that there were four "offense date[s]" — not just the one for which McCoy was tried. Specifically, on direct examination,

the expert testified that she had "four separate evidence receipts." She explained, "So even though all four of them came into the laboratory at the same time, if you look in the center of the evidence receipt, it has an offense date of April 4, 2016; April 11, 2016; April 18, 2016; and May 9, 2016." She added that each sample had to be tested "per . . . protocol."

The expert's testimony violated a pre-trial ruling. The three prior dates apparently related to a confidential informant's "controlled purchases" at the home. After the jury was impaneled but before trial began, the trial court had confirmed that there would be no testimony "about anything the confidential informant did, including surveillance of . . . him or her going to the property, purchasing anything and leaving the property." The prosecutor agreed.

The court did allow witnesses to testify that they had seen persons other than the informant. But no witness testified to seeing anyone but McCoy.

Although defense counsel did not object when the laboratory expert referred to multiple offense dates, the judge called for a side-bar as soon as the expert answered the prosecutor's question. However, the transcript reports the side-bar exchange as essentially indecipherable (except for the prosecutor's statement that only one sample was actually tested).

Once the witness resumed her testimony, she again referred to multiple dates, noting that the scientist who actually did the testing "was assigned to do one item from each date." Defense counsel did not object.

After defense counsel briefly cross-examined the expert to confirm that the cocaine weighed less than a half-ounce, the prosecutor asked for a side-bar. Again, the transcript reports the lawyers' comments as largely indecipherable.

But during the side-bar, the judge clearly stated that he intended to deliver a curative instruction. Referring to May 9, when police searched the home and arrested McCoy, the judge stated:

> As a matter of fact, I'm going to give a limiting instruction to the jurors with reference to samples.
>
> . . . .
>
> I don't want the (indecipherable). I want the record to be clear (indecipherable) not consider any reference to anything prior to May 9, okay. All right. For reasons that I have explained (indecipherable).

The prosecutor consented. However, the judge never delivered the instruction.

In summation, defense counsel argued that McCoy, one of several family members who visited the home, was unaware of the cocaine in the living room. The prosecutor pointed out that McCoy was the only person present when police entered the home; that the drugs were easily discernable in a clear container; and

that the drugs, scale, and plastic bags were in the only room that was actively occupied when the police entered.

But the prosecutor did not stop there. She bolstered the State's case by asserting, without evidential support, that police saw multiple people coming and going at the Vineland home. According to her account, Trooper Cresci testified that he not only saw defendant "consistently enter[ing] and exit[ing] this house," but that he also saw "a lot of foot traffic and other people continuously enter through" the same door. She embellished:

> [H]e explained to you that during the time that these observations were met [sic], people would come to this particular residence on this side of the door on foot, in cars, at all times of night. They would enter and they would be greeted by the defendant. The defendant would allow them in the house, they would stay there for -- and you remember. I want you to recall specifically how long he stated that he would -- that those people would be in there for. Not long. Seconds. He described it as what would be seconds. And after that, they would leave.

As noted, the trooper said nothing of the kind. He testified that the only person he ever saw at the home was defendant.

The jury evidently accepted the prosecutor's false characterization of the trooper's testimony. Shortly after the jury began deliberating, it asked, "Can you confirm that Mr. McCoy was the only one in the house during the investigation

when people were coming in and out of the house for seconds at a time?" The court responded, "We're not here to tell us [sic] what the facts are. So you have to make that determination as to those facts in this case." Defense counsel did not object during or after this exchange.

The jury also requested a playback of the trooper's testimony, but before the playback, an alternate juror was substituted, and the jury began deliberating anew. The reconstituted jury again asked for the playback and the court obliged.

Less than three hours later, the jury rendered its verdict.

Defendant presents the following points for our consideration:

> POINT I
>
> WHILE THE COURT RECOGNIZED THE IMPROPRIETY OF EVIDENCE THAT McCOY HAD COMMITTED DRUG CRIMES ON PRIOR OCCASIONS THAT WERE NOT CHARGED IN THE INDICTMENT, IT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO STRIKE THAT TESTIMONY AND PROVIDE THE LIMITING INSTRUCTION THAT IT RECOGNIZED WAS REQUIRED.
>
> POINT II
>
> A NEW TRIAL IS REQUIRED BECAUSE THE PROSECUTOR TOLD THE JURORS IN HER SUMMATION ABOUT EVIDENCE, NEVER PRESENTED AT TRIAL, THAT ESTABLISHED THAT McCOY WAS A DRUG DEALER. (NOT RAISED BELOW).

POINT III

BECAUSE THE DEFENSE TO THE DRUG CHARGES WAS THAT McCOY DID NOT POSSESS THE NARCOTICS BUT WAS MERELY PRESENT IN THE ROOM WHERE THEY WERE LOCATED, THE COURT COMMITTED REVERSIBLE ERROR WHEN IT OMITTED THE PARAGRAPH OF THE MODEL CHARGE ON "POSSESSION" THAT ADDRESSES "MERE PRESENCE." (NOT RAISED BELOW).

POINT IV

THE COURT SHOULD REVERSE BASED ON CUMULATIVE ERROR. (NOT RAISED BELOW).

We are persuaded that the laboratory expert's uncured reference to multiple offense dates and drug samples, combined with the prosecutor's uncorrected misstatement about people visiting and interacting with defendant at all hours of the night, may have "led the jury to a result it otherwise might not have reached." See State v. Macon, 57 N.J. 325, 336 (1971). That is plain error. Id. at 337. Thus, it warrants reversal, notwithstanding defense counsel's failure to object.

The competent and admissible evidence against McCoy was less than overwhelming. Notably, the jury did not find that McCoy possessed the gun in the course of committing a drug crime — perhaps because police found the gun

10

outside the room with the drugs, or perhaps because DNA analysis failed to link McCoy to the gun.

Obviously, someone possessed the gun and drugs that police found in the home. On one hand, McCoy was the only person present when police seized the items. Furthermore, the trooper often saw McCoy at the house. On the other hand, McCoy's mother testified that other adult family members, including McCoy's brother, visited the home and had access to the room where the drugs were found.

The expert's reference to multiple offense dates and multiple drug samples helped link the drugs to McCoy. Her testimony suggested uncharged drug crimes, and although she did not mention McCoy in connection with those crimes, the jury could easily infer his involvement. McCoy was the only constant presence at the home, in the eyes of the surveilling trooper.

"The likelihood of prejudice is acute when the proffered evidence is proof of a defendant's uncharged misconduct." State v. Stevens, 115 N.J. 289, 302 (1989) (quoting Edward J. Imwinkelried, The Need to Amend Federal Rule of Evidence 404(b): The Threat to the Future of the Federal Rules of Evidence, 30 Vill. L. Rev. 1465, 1487 (1985)). Evidence of previous crimes "risks conviction because the jury may conclude defendant is a bad person with a propensity to

commit crimes." State v. Herbert, 457 N.J. Super. 490, 509 (App. Div. 2019) (citations omitted).

A court must exclude other-crimes evidence unless the proponent offers it for a permissible purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b)(2). Even then, the evidence of the uncharged crimes must be clear and convincing, and its prejudice must not outweigh its probative value. State v. Cofield, 127 N.J. 328, 338 (1992); and, in some cases, the uncharged conduct "must be similar in kind and reasonably close in time" to the charged offense, State v. Williams, 190 N.J. 114, 122, 131 (2007) (quoting Cofield, 127 N.J. at 338).

This rule guards against a jury concluding that, because a defendant likely sold drugs before, he must have been dealing drugs when he was arrested. See United States v. Barnes, 822 F.3d 914, 922 (6th Cir. 2016) (quoting United States v. Bell, 516 F.3d 432, 444 (6th Cir. 2008)) (noting "that Rule 404(b) prohibits . . . reasoning that amounts to 'once a drug dealer, always a drug dealer'").

In this case, the State did not try to use the testimony about other samples and "offense date[s]" for a permissible purpose. Nor did the State try to

demonstrate that the testimony's probative value outweighed its prejudice. Absent a permissible purpose, the court was obliged to instruct the jury to disregard the testimony, and not to infer from it that McCoy likely possessed the final set of drugs. Although the trial judge promised to instruct the jury to disregard the testimony regarding the other samples and "offense date[s]," he never gave that instruction.

We reject the State's suggestion that the laboratory expert's remark was made in passing and likely caused McCoy no harm. We have no reason to conclude that the expert's remark went unnoticed. For one thing, the judge halted the trial and called a sidebar immediately after the remark. In addition, the expert referred to multiple samples a second time. Compare Herbert, 457 N.J. Super. at 508–09 (reversing conviction because a detective's brief references suggesting defendant's gang involvement were "prejudicial" where "[e]ach time the detective referred to gangs, the trial came to an abrupt halt" and "[t]he second time . . . the jury gasped"), with Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) (stating that a "fleeting comment[]" about a previous crime "may not warrant a new trial, particularly when the verdict is fair").

We need not decide whether the laboratory expert's testimony, taken by itself, was sufficiently prejudicial to warrant a new trial. Rather, we consider

the cumulative impact of her testimony and the prosecutor's erroneous summation. We shall reverse even if "any one of several errors assigned would not in itself be sufficient to warrant a reversal . . . if all of them taken together justify the conclusion that defendant was not accorded a fair trial." State v. Weaver, 219 N.J. 131, 155 (2014) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)). Cumulatively, the laboratory expert's testimony and the prosecutor's misstatement warrant reversal.

The prosecutor asserted — without any evidential support — that McCoy welcomed people to the house at all hours of the night. The statement tied in neatly with the drug expert's testimony that heavy foot traffic suggested drug-dealing. It also refuted defense counsel's theory that one of McCoy's relatives possessed the drugs.

In State v. Farrell, 61 N.J. 99, 102 (1972), our Supreme Court held that "[i]t is error for a trial judge to permit a prosecutor in summing up to comment on facts not shown or reasonably inferable from the evidence in the case." The Farrell court reversed the defendant's conviction where the prosecutor improperly implied and referred to prejudicial information not in evidence. Id. at 102–03, 106–07.

Unlike in this case, however, defense counsel in <u>Farrell</u> objected and unsuccessfully sought a mistrial. <u>Id.</u> at 106. A defense counsel's silence is often powerful evidence that a misstatement should not be deemed prejudicial. <u>See</u> <u>State v. Frost</u>, 158 N.J. 76, 83–84 (1999); <u>State v. Johnson</u>, 31 N.J. 489, 511 (1960). And defense counsel's failure to object also deprives the court of the opportunity to correct the misstatement. <u>See</u> <u>Johnson</u>, 31 N.J. at 511.

Nonetheless, as Justice Brennan observed many years ago, "an appellate court is at liberty to upset the verdict if the prejudice done the defendant is apparent . . . even when the improper remarks have not been objected to by defense counsel." <u>State v. Bogen</u>, 13 N.J. 137, 142 (1953). Our Court has also noted that "[w]e have not hesitated to reverse convictions where we have found that the prosecutor in his [or her] summation overstepped the bounds of propriety and created a real danger of prejudice to the accused." <u>Johnson</u>, 31 N.J. at 511.

In light of the jury's question, the prejudicial nature of the prosecutor's remarks seems undeniable. Notwithstanding the judge's instruction that the prosecutor's statements were not facts, her statements evidently convinced the jury that "people were coming in and out of the house for seconds at a time."

The jury solely sought to confirm "that Mr. McCoy was the only one in the house" when other people came and went.

Although defense counsel did not object and thus prompt the court to cure the misstatement, the jury's question gave the court another chance to set the record straight. However, the court said only that the jury had to determine the facts. Where a prosecutor states "facts" lacking any support in the record, such an instruction effectively tolerates misstatements and fails to prevent an unjust result. See Farrell, 61 N.J. at 102.

Perhaps, after hearing the trooper's testimony read back, the jury was dissuaded from believing that people were coming and going at the Vineland home. But "perhaps" is not enough. Our Court has recognized that "because the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he [or she] will fairly fulfill his [or her] duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent." Farrell, 61 N.J. at 105. Furthermore, "[i]t is unlikely a juror will believe a prosecutor would intentionally mislead him [or her]." Ibid. As noted, the jury's own question indicated that it wanted to review the trooper's testimony merely to confirm that McCoy was the only person receiving the

A-3189-18T4

visitors.  The jury was apparently already convinced that other people visited the home.

In sum, the prosecutor's misstatement — particularly when coupled with the laboratory expert's reference to multiple offense dates and samples — was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  See Macon, 57 N.J. at 336; see also State v. G.E.P., 243 N.J. 362, 389–90 (2020) (applying this plain error standard).

Given our conclusion, we need not address at length defendant's argument that the court should have, sua sponte, delivered the "mere presence" jury instruction.[1]  Although we prefer courts to give the instruction, we are unpersuaded that its omission constitutes plain error.  The Court reached the same conclusion when faced with a similar argument in State v. Randolph, 228 N.J. 566, 592 (2017).

---

[1]  The "Mere Presence" section of the model jury instruction on possession, Model Jury Charges (Criminal), "Possession (N.J.S.A. 2C:2–1)" (rev. June 11, 2018), specifically instructs a jury that a "[d]efendant's mere presence" where drugs are found does not prove, beyond a reasonable doubt, constructive possession.  Mere presence is "a circumstance to be considered" along with other evidence of guilt.  Ibid.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3189-18T4