SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## State v. Rasul McNeil-Thomas (A-77-17) (080758)

**Argued January 3, 2019 -- Decided June 18, 2019**

**SOLOMON, J., writing for the Court.**

In May 2011, an off-duty Newark police officer was shot and killed in a restaurant. Defendant Rasul McNeil-Thomas was convicted by a jury of shooting the officer, among other crimes. In this appeal, the Court considers the Appellate Division's reversal of defendant's convictions upon its findings that a brief segment of video surveillance played during summation was not admitted into evidence at trial and that, during summation, the prosecutor improperly linked defendant to one of the vehicles shown in the video.

The Texas Fried Chicken and Pizza Restaurant, known as the "chicken shack," was at the intersection of Lyons Avenue and Clinton Place in Newark. As Officer William Johnson waited at the restaurant a silver Chevrolet Malibu slowly passed the chicken shack, as captured by the restaurant's exterior camera. Several rounds were fired from the front passenger window of the car into the restaurant. One of those bullets struck and killed Officer Johnson. Three others were wounded. The Malibu sped off.

Witnesses linked defendant to the Malibu, which had been carjacked from the driveway of a home near the restaurant. The carjacking victim identified defendant from a photo array as one of the two men who carjacked the Malibu. Two witnesses who were at the murder scene also identified defendant.

Investigating officers learned that, about an hour before the shooting, a street brawl took place in front of defendant's home between defendant and his family and a group of young women, including three later seen in the restaurant at the time of the shooting. According to the State, defendant's motive for the shooting was retribution.

Defendant's neighbor, who called 9-1-1 to report the brawl, told police she saw defendant and his stepfather leave together in a blue pickup truck shortly after the fight. The neighbor then saw both men return home, but defendant was in a black sedan -- which she described as "like" a Cadillac CTS -- with three other individuals, while the stepfather returned alone in the blue pickup truck. The neighbor also stated that defendant and one of the others got back into the black sedan and drove off, following the

stepfather in the blue pickup truck. The police obtained a search warrant and seized and photographed a blue Ford pickup truck belonging to defendant's stepfather.

The police also discovered that surveillance video from the scene had captured a pickup truck pass the restaurant shortly before the shooting, followed by a black sedan. Investigators developed the theory that defendant and his stepfather had driven by the chicken shack in search of the young women from the brawl and that, finding them there, defendant carjacked the Malibu and returned to shoot them.

Defendant was arrested the day after the shooting for carjacking the silver Malibu. He was later indicted for the murder of Officer Johnson, several attempted murders and aggravated assaults of other individuals, the carjacking, and other related offenses. A month-long trial followed, during which evidence offered by the State included the video surveillance footage from the restaurant's security cameras and digital stills created from the video footage, video surveillance footage from two nearby establishments, the testimony of defendant's neighbor who called 9-1-1, and the photos of the blue pickup truck processed by police.

Defendant's neighbor confirmed during her testimony that the pickup truck depicted in the police photos was the same truck she saw leaving defendant's home followed by the black sedan shortly before the shooting. On cross-examination, defense counsel vigorously challenged the neighbor's recollection.

The State also offered into evidence defendant's sworn statement, taken by police after his arrest, that he and his stepfather left the house together and traveled down Lyons Avenue in a dark green or dark blue Ford pickup truck around the time of the shooting. The route defendant described would have taken them past the chicken shack.

After the State called the owner of the chicken shack as its first witness to authenticate the restaurant's surveillance footage, defense counsel requested a sidebar, during which he stated that he "definitely [didn't] have any objections . . . to any of the portions they are going to play," but recognized that "the video itself contains a lot of material." Defense counsel stated that he "want[ed] to reserve, just for later" an objection to irrelevant footage "from like an hour before." The court interpreted defense counsel's request as an objection to "[d]owntime" and "extraneous stuff," but warned that once the video is played for the jury "[y]ou can't unring the bell." Defense counsel acknowledged that "everything played before the jury in the courtroom is in evidence, but we can talk about the scope later." The court admitted the restaurant's surveillance camera footage in its entirety into evidence "subject to sidebar."

Later, while the lead detective was on the stand, the State played the footage captured by the restaurant's security camera beginning forty-six seconds before a pickup truck followed by a sedan came into view. Seventy-six seconds after that video started,

2

the State fast forwarded to about a minute before the shooting.  Defense counsel did not object when the State played the videotape.

During defense counsel's summation, he reminded the jury of the neighbor's testimony that the stepfather left first in the pickup truck, while defendant followed in a black Cadillac.  He also asked the jury to discredit her testimony because "she [didn't] see all the people who got out of the black car."

During the State's closing argument, the prosecutor played the video footage captured by the chicken shack's exterior surveillance camera.  The prosecutor asked the jury to infer that the sedan shown in the video was the sedan described by the concerned neighbor as "like" a black Cadillac CTS, stating, "Cadillac CTS.  Cadillac CTS, black Cadillac CTS."  He also asserted that the pickup truck shown in the video traveling in front of the sedan was the same truck that the neighbor testified she saw defendant's stepfather driving on the night of the shooting.  Next, to show the jury the direction the two vehicles were heading, the prosecutor played a brief excerpt of videotape obtained from a restaurant one block west from the chicken shack, on the same side of Lyons Avenue, that showed both vehicles.  The video from a nearby bar showed only a black sedan traveling down another street after it stopped following the blue pickup truck.

Following summations, defense counsel made a motion for a mistrial claiming the prosecutor "played a piece of tape" not entered into evidence and "testified" about it.  The trial judge denied the motion, finding the footage was admitted into evidence and the prosecutor's remarks were fair comment on the evidence.

During deliberations, the jury sent a note stating, "We would like to see; the tape before the shooting which shows the blue truck and the black car.  It was only shown by the prosecutor at the closing statement.  Can/may we see this again?  Can it count as evidence?"  Over defense counsel's objection, the judge determined that the videos were in evidence.  Both videos were then played for the jury in open court.

The jury found defendant guilty of first-degree aggravated manslaughter for the death of Officer Johnson, as well as other offenses, and sentenced defendant.

The Appellate Division reversed defendant's convictions and remanded for a new trial, finding that videotape segments the prosecutor played during his closing remarks were not admitted into evidence.  According to the appellate court, that alleged error, coupled with the prosecutor's improper comments linking defendant to the vehicles shown in those video segments, deprived defendant of a fair trial.  In light of that holding, the Appellate Division did not consider sentencing arguments raised by defendant.

The Court granted the State's petition for certification.  234 N.J. 200 (2018).

3

**HELD:** The Court defers to the trial judge's determination that the disputed footage was played for the jury during the State's case-in-chief and notes that defense counsel consented to the admission of the surveillance footage depicting the moments surrounding the shooting, including the video segment at issue. The court did not abuse its discretion in permitting the prosecutor to play the video segment during his closing remarks, and the prosecutor's comments were reasonable and fair inferences supported by the evidence presented at trial.

1. The Court first considers the contention that the five-second video segment obtained from the chicken shack's exterior surveillance camera was never admitted into evidence. A careful review of the trial transcript reveals that the court admitted the chicken shack's surveillance video in its entirety "subject to sidebar." At sidebar, defense counsel preserved an objection to the admission of extraneous footage "from like an hour before." Counsel's preserved objection had nothing to do with whether the disputed five-second segment was ever played for the jury. The trial judge made a factual determination that the disputed five-second segment of tape was played by the State during its case-in-chief, and the timestamped version of the lead detective's testimony supports that decision. Reliance on the jury's note to support the claim that the disputed video segment was never played during trial is an improper invitation to engage in speculation about a jury's deliberative process. There was sufficient, credible evidence in the record for the court to determine that the disputed snippet of tape was played for the jury and entered into evidence, and the court did not abuse its discretion in permitting the prosecutor to play the chicken shack video segment during his closing remarks. Further, the video clip from a nearby business, which was played for the jury without objection, showed a sedan following a pickup truck only seconds after the two vehicles would have passed the chicken shack. (pp. 19-22)

2. The Court next determines whether it was proper for the prosecutor to invite the jury to infer that the five-second segment showed defendant in a black sedan following his stepfather's pickup truck driving by the restaurant shortly before the shooting. Consistent with their obligation to seek justice, prosecutors may not advance improper arguments. Nevertheless, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments and are therefore afforded considerable leeway in closing arguments. As long as the prosecutor stays within the evidence and the legitimate inferences therefrom, there is no error. Furthermore, even when a prosecutor's remarks stray over the line of permissible commentary, to warrant the remedy of a new trial, there must have been some degree of possibility that the comments led to an unjust result. (pp. 22-24)

3. Because the prosecutor's alleged improprieties here involve comments made about the sedan following the pickup truck shown on the videotape driving by the restaurant about four minutes before the shooting, the Court reviews in detail the State's proofs about those two vehicles and defense counsel's response. (pp. 25-27)

4

4. Defendant asserts that the State unfairly surprised the defense by associating defendant with the black sedan following the pickup truck as it passed the chicken shack about four minutes before the shooting. But defense counsel's vigorous cross-examination of the neighbor and his plea during closing that the jury disregard her testimony about the black sedan demonstrate that the defense was aware of the video segment and its import. By his closing, the prosecutor here marshalled the police photos of the stepfather's pickup truck, the video surveillance footage, the neighbor's testimony, and defendant's own sworn statement -- that he traveled down Lyons Avenue with his stepfather in a Ford pickup truck around the time of the shooting -- to provide context to the jury. In doing so, he suggested that defendant was "eerily creeping" by the chicken shack about four minutes before the shooting to verify that the young women who assaulted his family were at the restaurant. After asking the jury to compare the paused videotaped image of the pickup truck with the truck depicted in the police photos, the prosecutor then pressed play; as the black sedan entered the frame, he stated, "Cadillac CTS, black Cadillac CTS." The prosecutor here permissibly sought to connect interrelated pieces; he did not improperly seek to provide some of the missing pieces. The prosecutor's comments during his summation regarding the two vehicles shown in the videotape were reasonable and fair inferences supported by the evidence at trial and fell within the boundaries of permissibly forceful advocacy. (pp. 27-31)

**The judgment of the Appellate Division is REVERSED, defendant's convictions are REINSTATED, and the matter is REMANDED to the Appellate Division for further proceedings.**

**JUSTICE LaVECCHIA, dissenting,** stresses that although prosecutors may piece together evidence during summation, they may not create pieces of evidence, and expresses the view that, in this trial, the assistant prosecutor crossed that line. Justice LaVecchia explains that in closing argument, the prosecutor declared -- no fewer than six times -- that the video depicted a black Cadillac CTS passing the restaurant before the shooting but that no witness testified to that key fact. Justice LaVecchia notes that the neighbor testified that she had seen defendant drive a black, four-door car that looked like a Cadillac but could not and did not identify it as a CTS. Nor did the State call a qualified lay or expert witness who might have offered testimony about the model of the cars in the short, grainy video clips. Justice LaVecchia is not convinced, beyond a reasonable doubt, that the outcome of the trial would have been the same without the prosecutor's testimony regarding the video during summation.

**JUSTICES PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion. JUSTICE LaVECCHIA filed a dissenting opinion, in which CHIEF JUSTICE RABNER and JUSTICE ALBIN join.**

SUPREME COURT OF NEW JERSEY
A-77 September Term 2017
080758

State of New Jersey,

Plaintiff-Appellant,

v.

Rasul McNeil-Thomas,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 3, 2019 | June 18, 2019 |

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Theodore N. Stephens, II, Acting Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the briefs).

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

Adam D. Klein, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).

1

On a night in May 2011, an off-duty Newark police officer was shot and killed in a restaurant while waiting to purchase a slice of pizza for his dinner. Defendant Rasul McNeil-Thomas was convicted by a jury of shooting the officer, among other crimes. In this appeal, we consider the Appellate Division's reversal of defendant's convictions upon its findings that a brief segment of video surveillance played during summation was not admitted into evidence at trial and that, during summation, the prosecutor improperly linked defendant to one of the vehicles shown in the video segment.

First, we disagree that the video was not admitted into evidence. We defer to the trial judge's determination that the disputed footage was played for the jury during the State's case-in-chief. And although defense counsel preserved an objection to the admission of extraneous surveillance footage, a careful review of the trial transcript shows that defense counsel consented to the admission of the surveillance footage depicting the moments surrounding the shooting, including the video segment at issue. We therefore find the court did not abuse its discretion in permitting the prosecutor to play the video segment during his closing remarks.

Next, we consider whether it was proper for the prosecutor to invite the jury to infer that the video segment showed defendant in one of the vehicles, following his stepfather in another, driving by the restaurant shortly before the shooting.  We conclude that the prosecutor's comments were reasonable and fair inferences supported by the evidence presented at trial.

We therefore reverse the judgment of the Appellate Division, reinstate defendant's convictions, and remand for consideration of defendant's sentencing arguments.

## I.

## A.

The trial transcript reveals that on a night in May 2011, William Johnson, an off-duty Newark police officer, waited for a slice of pizza at the Texas Fried Chicken and Pizza Restaurant, known as the "chicken shack." The restaurant was located at the intersection of Lyons Avenue and Clinton Place in Newark.  As Officer Johnson waited at the restaurant along with several others -- including a five-month-old baby -- a silver Chevrolet Malibu slowly passed the chicken shack, as captured by the restaurant's exterior surveillance camera.

The video showed a distinct muzzle flash emanating from the front passenger window of the car as several rounds were fired into the restaurant.

3

One of those bullets struck Officer Johnson in the chest, killing him. Three other patrons were wounded. The silver Malibu sped off, turning left on Lyons Avenue.

Surveillance video obtained from the nearby Bobby's Restaurant showed the silver Malibu turn off of Lyons Avenue, headed in the direction of where it was later found abandoned -- four blocks from the scene of the shooting and around the corner from defendant's residence. Among other items of evidential value, police recovered five spent shell casings from inside the silver Malibu and three shell casings from outside the restaurant. Ballistics analysis later established that the same nine-millimeter handgun fired three of the five shell casings found inside the car and the three shell casings recovered from outside of the restaurant.

Surveillance video obtained from St. Peter's Park, located between where the Malibu was abandoned and defendant's residence, showed two black males wearing hoodies walking through the park toward defendant's residence immediately after the shooting. A K-9 unit later tracked a scent from the driver's seat of the Malibu through the park and directly past the front of defendant's house before losing the scent near his home.

4

Witnesses also linked defendant to the Malibu, which had been carjacked from the driveway of a home located on Clinton Place, only a block-and-a-half away from the restaurant.

First, the carjacking victim described how she was sitting in the front passenger seat of her boyfriend's idling silver Malibu when a man who was wearing "some type of sweater or something" ordered her out of the car by tapping his gun on the driver's side window. As she exited the car, she saw a second man standing about a foot-and-a-half away from her wearing a hoodie; she could see the outline of a gun in his hoodie. By the time she reached the steps of her boyfriend's home, she heard the car speeding out of the driveway. Seconds later, she heard the sound of gunshots coming from the chicken shack down the block. She was shown a photo array about seven hours after the incident but was unable to make an identification. Later that afternoon, police showed her the same photo lineup, and the carjacking victim identified defendant as the man wearing a hoodie.

Two witnesses who were at the murder scene also identified defendant. The first witness, who was standing directly outside of the chicken shack as the shots were fired from the Malibu, identified defendant as one of the shooters from a photo array about three months after the murder. At trial, she explained to the jury that initially she did not want to get involved with the

5

investigation because she was too scared to come forward. It was also revealed on direct examination that she used one "deck"[1] of heroin at noon on the day of the murder, but she testified that she was not under the influence at the time of the shooting, more than nine hours later.

The second witness, who knew defendant and his family, was standing in the front doorway of the restaurant and facing the street as the Malibu approached. She told investigators in a videotaped statement just hours after the incident that she "locked eyes" with one of the shooters, whom she identified as defendant. She also identified defendant through a photo array later that same night. At trial, however, the witness recanted while on the stand. A Gross[2] hearing was held, during which the State called the two investigators who conducted the videotaped interview of the witness on the night of the murder. The court found that the witness "told the truth at the time" she provided her videotaped statement, which was then admitted into evidence and played for the jury.

---

[1] "Decks" of heroin refer to the "little glassine packets" that contain "the powdery substance." State v. Morrison, 188 N.J. 2, 5 (2006); see State v. Gonzales, 227 N.J. 77, 86 n.4 (2016) ("Each glassine envelope is known as a deck.").

[2] State v. Gross, 216 N.J. Super. 98 (App. Div. 1987).

Investigating officers learned that, about an hour before the shooting, a street brawl took place in front of defendant's home between defendant and his family and a group of young women, including three later seen in the restaurant at the time of the shooting. According to the State, defendant's motive for the shooting was retribution for that earlier assault against defendant and his family.

Defendant's neighbor, who called 9-1-1 to report the street brawl, told police she saw defendant and his stepfather leave defendant's home together in a blue pickup truck shortly after the fight was over. According to the neighbor, she then saw both men return home, but defendant was in a black sedan -- which she described as "like" a Cadillac CTS -- with three other individuals, while the stepfather returned alone in the blue pickup truck. The neighbor also stated that, after a brief discussion outside of defendant's residence, defendant and one of the others got back into the black sedan and drove off, following the stepfather in the blue pickup truck. As part of their investigation, the police obtained a search warrant and seized, processed, and photographed a blue 1993 Ford pickup truck belonging to defendant's stepfather, with custom chrome fender flares and a damaged rear bumper.

Significantly, the police also discovered that surveillance video from the scene had captured a pickup truck pass the restaurant shortly before the

7

shooting, followed by a black sedan. Investigators developed the theory that defendant and his stepfather had driven by the chicken shack in search of the young women from the brawl and that, finding them there, defendant carjacked the Malibu and returned to shoot them.

B.

Defendant was arrested the day after the shooting for carjacking the silver Malibu. He was later indicted for the murder of Officer Johnson, several attempted murders and aggravated assaults of other individuals, the carjacking, and other related conspiracy and weapons offenses.

A month-long trial followed, during which evidence offered by the State included the video surveillance footage from the restaurant's security cameras and digital stills created from the video footage, video surveillance footage from two nearby establishments, the testimony of defendant's neighbor who called 9-1-1, and the photos of the blue pickup truck processed by police.

Defendant's neighbor confirmed during her testimony that the pickup truck depicted in the police photos was the same truck she saw leaving defendant's home followed by the black sedan shortly before the shooting. On cross-examination, defense counsel vigorously challenged the neighbor's recollection of the vehicular traffic in front of her home that evening. Specifically, he questioned her extensively on the order in which the pickup

8

truck and the sedan left the home, as well as her ability to recall who was in the black sedan.

The State also offered into evidence defendant's sworn statement taken by police after his arrest. Although he could not recall the exact time, defendant stated that he and his stepfather left the house together and traveled down Lyons Avenue in a dark green or dark blue Ford pickup truck around the time of the shooting to "look for music."[3] The route defendant described would have taken them past the chicken shack.

After the State called the owner of the chicken shack as its first witness to authenticate the restaurant's surveillance footage, defense counsel requested a sidebar, during which he stated that he "definitely [didn't] have any objections . . . to any of the portions they are going to play," but recognized that "the video itself contains a lot of material." Defense counsel stated that he "want[ed] to reserve, just for later" an objection to irrelevant footage "from like an hour before." The court interpreted defense counsel's request as an objection to "[d]owntime" and "extraneous stuff," but warned that once the video is played for the jury "[y]ou can't unring the bell." Defense counsel

---

[3] Defendant estimated that he and his stepfather left sometime between 9:00 p.m. and 9:30 p.m. and were gone for about four minutes. Investigators were able to identify that the shots were fired into the chicken shack at exactly 9:49 p.m. by utilizing "ShotSpotter" technology.

9

acknowledged that "everything played before the jury in the courtroom is in evidence, but we can talk about the scope later." The court admitted the restaurant's surveillance camera footage in its entirety into evidence "subject to sidebar."

Later, while the lead detective assigned to the investigation was on the witness stand, the State played the footage captured by the restaurant's exterior security camera beginning forty-six seconds before a pickup truck followed by a sedan came into view. While the video played, the detective explained to the jury how it showed cars traveling on "Clinton Place north," intersecting with Lyons Avenue going "east and west," and that he "spent a significant amount of time trying to figure out about the cars that were coming in and out of this location." Seventy-six seconds after that video segment started, the State fast forwarded to about a minute before the shooting.[4] Notably, defense counsel did not object when the State played the videotape showing vehicular traffic,

---

[4] In response to defendant's claim that the disputed five seconds of tape were never played for the jury prior to summations, the State submitted a timestamped version of the lead detective's testimony. That transcript reveals that the State began playing the video "that shows the cars" at 11:59:54 a.m. At 12:01:10 p.m. -- seventy-six seconds after the tape was started -- the State stopped the video. According to the State, the disputed five-second segment showing both vehicles driving by the restaurant was included within that seventy-six-second segment of video played by the State during the detective's testimony.

including a pickup truck followed by a sedan, passing by the restaurant about four minutes before the shooting.

C.

During defense counsel's summation, he reminded the jury of the neighbor's testimony that the stepfather left first in the pickup truck, while defendant followed in a black Cadillac. He also asked the jury to discredit her testimony because "she [didn't] see all the people who got out of the black car."

During the State's closing argument, the prosecutor played the video footage captured by the chicken shack's exterior surveillance camera, along with videotape from two nearby businesses: Bobby's Restaurant and the Oasis Bar.[5] The State first played the chicken shack video, which showed cars driving through the intersection of Lyons Avenue and Clinton Place. The prosecutor paused the tape when a pickup truck entered the video frame. He then showed the photos depicting the blue pickup truck processed by the police next to the image of the pickup truck on the paused videotape so the jury could compare the two. He asked the jurors:

> What do you see? You could see a blue pickup truck.
> You could see a blue pickup truck. You could see the
> same headlights. You could see the same headlights.

---

[5] At trial, the State called the owners of both of those establishments to authenticate the surveillance camera footage before moving it into evidence.

> You can't see the license plate, but if you look in the light, you know what you can see? You can see the defect in the bumper. There's a defect in the bumper. The bumper had been hit. The bumper had been hit and you can see the car eerily creeping up Clinton Place going northbound right by the chicken shack, about three minutes and 46 seconds before the bullets were fired.

The prosecutor then resumed playing the chicken shack video, and a sedan entered the frame, following the pickup truck. The prosecutor asked the jury to infer that the sedan shown in the video was the sedan described by the concerned neighbor as "like" a black Cadillac CTS, stating, "Cadillac CTS. Cadillac CTS, black Cadillac CTS." He also asserted that the pickup truck shown in the video traveling in front of the sedan was the same blue, eighteen-year-old truck that the neighbor testified she saw defendant's stepfather driving on the night of the shooting -- with the custom chrome fender flares and the distinctive damaged rear bumper, as depicted in the police evidence photos.

Next, to show the jury the direction the two vehicles were heading after they passed the chicken shack, the prosecutor played a brief excerpt of videotape obtained from Bobby's, which was located one block west of the

12

chicken shack, on the same side of Lyons Avenue.[6] The prosecutor paused the Bobby's tape as both vehicles entered the frame, urging the jury to "[t]ake a look. Pickup truck. Cadillac CTS." After reminding the jurors that both vehicles would have passed the idling Malibu as they traveled northbound on Clinton Place before reaching the chicken shack, the prosecutor resumed playing the Bobby's tape. The video showed the sedan suddenly turning left while the pickup truck continued straight on Lyons Avenue. The prosecutor urged the jury to consider the significance of the sedan's turn, arguing that "as soon as the Cadillac makes a left turn . . . you know what, he's one block away from [the carjacking victim] sitting in that Malibu."

The prosecutor then played a short clip of footage from the Oasis Bar's exterior surveillance camera, which showed only a black sedan traveling down Aldine Street -- the street that the black sedan suddenly turned onto after it stopped following the blue pickup truck. Once again he argued to the jury that the black sedan shown in the Oasis Bar's video was the same Cadillac CTS that was the subject of the neighbor's testimony.

Following summations, defense counsel made a motion for a mistrial claiming the prosecutor "played a piece of tape" not entered into evidence and

---

[6] It is undisputed that the Bobby's surveillance camera footage was admitted into evidence and played by the State, without objection, during the testimony of both the restaurant's owner and the lead investigator.

"testified" about it. The trial judge denied the motion, finding the footage was admitted into evidence and the prosecutor's remarks were fair comment on the evidence. The court accordingly refused to give a curative instruction on the prosecutor's comments about the vehicles and their association with defendant.[7]

During deliberations, the jury sent a note stating, "We would like to see; the tape before the shooting which shows the blue truck and the black car. It was only shown by the prosecutor at the closing statement. Can/may we see this again? Can it count as evidence?" Over defense counsel's objection, the judge determined that, since both the chicken shack and Bobby's videos showing "the blue truck and the black car" were in evidence, they could be viewed again and considered by the jury. Both videos were then played for the jury in open court.

## D.

The jury acquitted defendant of first-degree murder but found him guilty of the lesser-included offense of first-degree aggravated manslaughter for the death of Officer Johnson. The jury also found defendant guilty of conspiracy

---

[7] The judge gave a standard jury charge, which included the following: "Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think is important in this case, you must rely solely upon your understanding during the trial."

to commit carjacking, carjacking, conspiracy to commit murder, the attempted murder and aggravated assault of some of the other restaurant patrons who were injured, and various other weapons-related offenses. Defendant was sentenced to serve two consecutive terms of thirty years of imprisonment, with a period of parole ineligibility of eighty-five percent under the No Early Release Act, N.J.S.A. 2C:43-7.2.

The Appellate Division reversed defendant's convictions and remanded for a new trial, finding that videotape segments the prosecutor played during his closing remarks -- the chicken shack, Bobby's, and the Oasis Bar's footage -- were not admitted into evidence. According to the appellate court, that alleged error, coupled with the prosecutor's improper comments linking defendant to the vehicles shown in those video segments, was so egregious that defendant was deprived of a fair trial. In light of that holding, the Appellate Division did not consider sentencing arguments raised by defendant.

We granted the State's petition for certification. 234 N.J. 200 (2018). We also granted amicus curiae status to the Attorney General of New Jersey.

## II.

Defense counsel's mistrial motion raised only whether the five-second segment of the chicken shack video showing a pickup truck followed by a sedan was admitted into evidence and played for the jury during the State's

15

case-in-chief and so, in this appeal, the parties' contentions focus only on that particular segment of video.

The State maintains that the five-second segment of videotape that shows a pickup truck followed by a sedan as both vehicles passed the chicken shack approximately four minutes before the shooting was entered into evidence and played for the jury during the testimony of the lead investigator. In the State's view, the Appellate Division failed to afford proper deference to the trial court's finding that the disputed footage was admitted.

Moreover, the State contends that, based on the totality of the evidence presented at trial, it was reasonable for the prosecutor to invite the jury to infer that the two vehicles shown in the surveillance footage were the same two vehicles that the concerned neighbor saw leaving defendant's residence after the brawl but before the shooting. Finally, the State argues that its proofs were overwhelming and that the evidence in question, if admitted in error, was incapable of causing an unjust result.

The Attorney General adds that the Appellate Division should have deferred to the trial judge's determination that the video segment was in evidence, rather than jettisoning the appropriate standard of review to make its own factual findings. According to the Attorney General, any alleged error by

16

the prosecutor during his summation was harmless, especially in light of the substantial evidence of defendant's guilt.

In response, defendant asserts that the five-second segment of surveillance video played by the State during its closing was admitted "subject to sidebar" but never played for the jury at trial, and thus never admitted into evidence. Relying on the question the jury sent to the court during deliberations, defendant maintains that there is no way to be certain that the clip was ever played for the jury because the State failed to specifically ask the lead investigator on direct examination whether the pickup truck in the video was defendant's stepfather's truck. Furthermore, even if the video was admitted into evidence, defendant contends that it was improper for the prosecutor to argue that defendant was in the black sedan shown in the video because the only witness who testified to seeing him enter that vehicle was never shown the videotape. According to defendant, the prosecutor's actions denied him a meaningful opportunity to present a complete defense in violation of both the Federal and State Constitutions.

### III.

We begin our analysis by addressing defendant's contention that the five-second video segment obtained from the chicken shack's exterior surveillance camera was never admitted into evidence.

17

## A.

At the outset, we acknowledge "[t]he traditional deference given to factual findings of the trial court" and its "deep roots in our jurisprudence." State v. S.S., 229 N.J. 360, 374 (2017). Appellate courts "have long deferred to trial courts' factual determinations because they 'hear and see the witnesses and . . . have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.N., 231 N.J. 497, 513 (2018) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Further, that deferential standard of review applies "regardless of whether the evidence is live testimony, a videotaped statement, or documentary evidence." Id. at 514; see S.S., 229 N.J. at 379 ("[A] standard of deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence, best advances the interests of justice in a judicial system that assigns different roles to trial courts and appellate courts.").

We have repeatedly emphasized that, when reviewing the findings of a trial court, "the customary role of an appellate court is not to make factual findings but rather to decide whether those made by the trial court are supported by sufficient credible evidence in the record." S.S., 229 N.J. at 365; see State v. Nantambu, 221 N.J. 390, 402-03 (2015) ("[W]e uphold the facts found by the . . . judge to the extent they are supported by sufficient credible

18

evidence in the record . . . .").  Limiting the role of a reviewing court is necessary because "[p]ermitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants.'"  S.S., 229 N.J. at 380-81 (second alteration in original) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment).  As a result, the trial court's factual determination in this case that the video segment at issue was played to the jury during the State's case-in-chief is "subject to limited appellate scrutiny, as [it is] reviewed under the abuse of discretion standard."  State v. Buda, 195 N.J. 278, 294 (2008) (citing Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)).

A careful review of the trial transcript reveals that the court admitted the chicken shack's surveillance video in its entirety "subject to sidebar."  At sidebar, defense counsel preserved an objection to the admission of extraneous footage "from like an hour before."  Indeed, counsel acknowledged that "[t]he video itself contains a lot of material," but then noted, "we can talk about the scope later" if necessary.  Yet the videotape was the subject of extensive testimony and cross-examination, and its scope went unchallenged by defense counsel while it was played for the jury.  If counsel considered the vehicular traffic driving by the restaurant four minutes before the shooting to be irrelevant and prejudicial, we presume he would have objected, as he did when

the State played other segments of the videotape depicting events minutes after the shooting.[8]  In short, counsel's preserved objection had nothing to do with whether the disputed five-second segment was ever played for the jury. Defense counsel objected only to irrelevant footage "from like an hour before," and consented to the admission of the surveillance footage depicting the moments surrounding the shooting.

The judge who presided over this month-long trial during which he "hear[d] and [saw] the witnesses," S.N., 231 N.J. at 513 (quoting Johnson, 42 N.J. at 161), made a factual determination that the disputed five-second segment of tape showing both vehicles passing by the restaurant was played by the State during its case-in-chief.  Indeed, the timestamped version of the lead detective's testimony supports the trial court's decision, as does the detective's explanation to the jury while the video played of how he "spent a significant amount of time trying to figure out about the cars that were coming in and out of this location."  That the prosecutor did not ask the detective to identify the pickup truck shown on the video is immaterial and has no relevance to whether the disputed five-second video segment was played for the jury during the State's case-in-chief.

---

[8]  For example, defense counsel promptly objected to the specific portion of tape that showed Officer Johnson lying on the floor of the restaurant in a pool of blood as highly prejudicial under N.J.R.E. 403.

20

Finally, defendant's reliance on the jury's note to support his claim that the disputed video segment was never played during trial is unpersuasive and an improper invitation to "engage in speculation about a jury's deliberative thought process." State v. Wilder, 193 N.J. 398, 416 (2008). In declining that invitation, we recognize "the reality that jurors cannot be expected to have perfect recall of every bit of evidence introduced during a trial." State v. Miller, 205 N.J. 109, 120 (2011).

In light of the discretion afforded trial court evidentiary rulings, see Buda, 195 N.J. at 294, and in keeping with our deeply-rooted tradition of deference to a trial court's factual findings, S.S., 229 N.J. at 374, we conclude there was sufficient, credible evidence in the record for the trial court here to determine that the disputed five-second snippet of tape was played for the jury and entered into evidence.

Accordingly, we find that the court did not abuse its discretion in permitting the prosecutor to play the chicken shack video segment during his closing remarks. In doing so, we also recognize that the video clip from Bobby's, which was played for the jury during the lead detective's testimony without objection, showed a sedan following a pickup truck traveling down Lyons Avenue, only seconds after the two vehicles would have passed the chicken shack. Hence, the Appellate Division's initial premise relied upon in

21

reversing defendant's conviction -- that the videotape segments the prosecutor played during his closing remarks were not admitted into evidence -- is erroneous.

## IV.

Having established that the trial court did not abuse its discretion in allowing the State to play the disputed videotape during its summation, we now determine whether it was proper for the prosecutor to invite the jury to infer that the five-second segment showed defendant in a black sedan following his stepfather's pickup truck driving by the restaurant shortly before the shooting.

## A.

This Court recognizes "[t]he seminal role prosecutors play" in our criminal justice system. State v. Mahoney, 188 N.J. 359, 376 (2006); see State v. Smith, 212 N.J. 365, 402 (2012) ("New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters . . . ."). We have described that role as "uniquely challenging" because it is a "double calling -- to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done." Mahoney, 188 N.J. at 376 (quoting State v. Ramseur, 106 N.J. 123, 323-24 (1987)).

"Consistent with their obligation to seek justice, prosecutors may not advance improper arguments." State v. Lazo, 209 N.J. 9, 29 (2012). "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." State v. Frost, 158 N.J. 76, 83 (1999) (quoting State v. Farrell, 61 N.J. 99, 105 (1972)).

Nevertheless, "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are therefore "afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Id. at 82. In other words, as long as the prosecutor "stays within the evidence and the legitimate inferences therefrom," State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)), "[t]here is no error," State v. Carter, 91 N.J. 86, 125 (1982). "Ultimately it [is] for the jury to decide whether to draw the inferences the prosecutor urged." Carter, 91 N.J. at 125.

Furthermore, even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end. Rather, we weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," and we reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive defendant of a

23

fair trial." State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)); see State v. Jackson, 211 N.J. 394, 408-09 (2012) ("'[N]ot every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." (quoting State v. Williams, 113 N.J. 393, 452 (1988))).

"Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" Jackson, 211 N.J. at 409 (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)). Notably, a determination as to whether a prosecutor's comments had the capacity to deprive defendant of a fair trial must be made "within the context of the trial as a whole." State v. Feaster, 156 N.J. 1, 64 (1998) (citing Ramseur, 106 N.J. at 323); accord State v. Johnson, 31 N.J. 489, 513 (1960) ("Particular remarks must be appraised in the setting of the whole trial.").

To warrant the remedy of a new trial, there must have been "some degree of possibility that [the prosecutor's comments] led to an unjust result." R.B., 183 N.J. at 330 (quoting State v. Bankston, 63 N.J. 263, 273 (1973)). And that "possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting Bankston, 63 N.J. at 273).

B.

Because the prosecutor's alleged improprieties here involve comments made about the sedan following the pickup truck shown on the videotape driving by the restaurant about four minutes before the shooting, we must first set forth in some detail the State's proofs about those two vehicles -- along with defense counsel's response -- before we address the inferences the State invited the jury to draw.

The video surveillance tape obtained from the restaurant's exterior camera showed a sedan following a pickup truck driving past the restaurant about four minutes before the shooting. The State entered eight photographs of the stepfather's blue Ford pickup truck into evidence through the testimony of defendant's across-the-street neighbor. Those photos, taken by police as part of processing the vehicle, depicted distinctive custom chrome fender flares over each of the four tires, as well as noticeable damage to the passenger-side rear bumper. The State also entered into evidence two digital stills from the chicken shack's surveillance video showing a pickup truck as it drove by the restaurant.

The neighbor stated that she had observed defendant and his stepfather leave their home together in a blue pickup truck. During direct examination, when shown the photos of the blue pickup truck that the police processed, the

25

neighbor confirmed that the truck in those photos was the same truck she saw defendant and his stepfather drive away in on the night of the shooting.

That testimony was supported by defendant's own statement that, although he could not recall the exact time, he and his stepfather left the house together and traveled down Lyons Avenue in a dark green or dark blue Ford pickup truck around the time of the shooting to "look for music." The route defendant described to the police would have taken them past the chicken shack before the shooting.

When the pair returned home, the neighbor noticed that the stepfather was alone in the pickup truck, while defendant came back in "another car" with three other individuals. When asked to describe the other car defendant was in, the neighbor said it looked "like a Cadillac." She characterized it as one of "the newer ones." Not one of the "boxier" older models, but a black, four-door sedan with a "round" body -- what she perceived to be a Cadillac CTS. She then explained that shortly before the shooting, defendant and one of the other individuals got back into the black sedan and drove off, following the stepfather in the blue pickup truck.

On cross-examination, defense counsel vigorously challenged the neighbor's recollection of the vehicular traffic in front of her home that evening. Specifically, he questioned her extensively on the order in which the

pickup truck and the sedan left the home, as well as her ability to recall who was in the black sedan. Later, during his summation, defense counsel himself reminded the jury of the neighbor's testimony that the stepfather left first in the pickup truck while defendant followed in a black Cadillac.[9] He asked the jury to discredit her testimony because "she [didn't] see all the people who got out of the black car," not because of her description of the vehicles.

C.

In light of the evidence presented at trial, as well as defense counsel's cross-examination of the concerned neighbor and his arguments at closing

---

[9] During his summation, defense counsel correctly summarized the neighbor's testimony, which was as follows:

> Q: What did you say about the Cadillac, ma'am?
> A: That they all -- they got back into the Cadillac, or the Caddy, and drove off. And I said, I say black Caddy because that's what it looked like to me.
> Q: Who was driving that black Caddy?
> A: I'm not really sure.
> Q: How many people were in that Cadillac?
> A: Four.
> Q: And when that left, was the defendant in that Cadillac?
> A: Yes.
> Q: And when it left, did it leave with any other cars?
> A: Yes.
> Q: What car did it leave with?
> A: They followed -- the father left and then the car left.
> Q: When you say, "the father left," what car was the father driving?
> A: The pickup truck.

about the neighbor's testimony, we now analyze the specific comments made by the State in its summation, mindful of the unique role that prosecutors play in our criminal justice system -- "to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done." Mahoney, 188 N.J. at 376 (quoting Ramseur, 106 N.J. at 323-24).

Defendant asserts that the State unfairly surprised the defense by associating defendant with the black sedan following the pickup truck as it passed the chicken shack about four minutes before the shooting. Specifically, defendant suggests that his surprise denied him a meaningful opportunity to present a complete defense. He makes this assertion notwithstanding defense counsel's vigorous cross-examination of the neighbor about her memory of the order of the vehicles as they pulled away from defendant's home, and his plea during closing that the jury disregard the neighbor's testimony about defendant being inside the black sedan.

Clearly, defense counsel was aware of the video segment and its import. While the prosecution is obliged "to refrain from improper methods calculated to produce a wrongful conviction," Frost, 158 N.J. at 83 (quoting Farrell, 61 N.J. at 105), the State is under no duty to announce to the defense each inference it will ask the jury to reach during summation. In this case, the

28

inferences suggested by the prosecutor were ones that defense counsel's conduct at trial shows he was aware of and anticipated.

By his closing, the prosecutor here marshalled the police photos of the stepfather's pickup truck, the video surveillance footage, the neighbor's testimony about the black sedan, and defendant's own sworn statement -- that he traveled down Lyons Avenue with his stepfather in a dark green or dark blue Ford pickup truck around the time of the shooting -- to provide context to the jury. In doing so, he suggested that defendant was "eerily creeping" by the chicken shack about four minutes before the shooting to verify that the young women who assaulted his family were at the restaurant. After asking the jury to compare the paused videotaped image of the pickup truck with the truck depicted in the police photos, the prosecutor then pressed play; as the black sedan entered the frame, he stated, "Cadillac CTS, black Cadillac CTS."

However, unlike the prosecutor in Feaster who had no evidential support for his assertion, 156 N.J. at 56, the prosecutor here invited jurors to adopt "inferences" about both vehicles "that [they] could draw from proven facts," Carter, 91 N.J. at 125 -- the photos, the video footage, and the neighbor's testimony. The prosecutor here permissibly sought to connect interrelated pieces; he did not improperly seek "to provide some of the missing pieces." See Feaster, 156 N.J. at 56. The jury was given the opportunity to

29

simultaneously compare the truck on the videotape with the police photos showing its distinct features (the chrome fender flares and the damaged rear bumper), all of which were properly admitted into evidence. In light of the neighbor's confirmation that the pickup truck she saw coming and going that evening was the same vehicle as shown in the police photos, we find it was reasonable for the prosecutor to invite the jury to infer that the pickup truck shown on the videotape was the stepfather's blue 1993 Ford pickup truck.

Additionally, given the neighbor's testimony, we find that the prosecutor's identification of the sedan as the Cadillac CTS described by the neighbor was fair comment on the evidence and a legitimate inference "based on sharply disputed facts in the record." Lazo, 209 N.J. at 29. Indeed, defense counsel's forceful cross-examination challenging the neighbor's recollection of the order in which the pickup truck and the sedan left the home, as well as who was in the sedan, establishes that the facts surrounding the vehicular traffic in front of defendant's home prior to the shooting were contested by both parties. Unlike in Feaster, where we determined the prosecutor's comments were highly improper because he strayed beyond the evidence by suggesting in summation that the defendant had loaded a gun during a car ride with "no basis [for that comment] in the record," 156 N.J. at 62, here the prosecutor did not deviate from the "evidence revealed during the trial" at any

30

point during his summation, see Mahoney, 188 N.J. at 376 (quoting State v. Smith, 167 N.J. 158, 178 (2001)).

In sum, the prosecutor's argument that the videotape showed a Cadillac CTS following the stepfather's pickup truck shortly before the shooting was "reasonably related to the scope of the evidence presented," Frost, 158 N.J. at 82, and fell squarely "within the considerable leeway afforded [to prosecutors] in closing argument," Lazo, 209 N.J. at 29 (internal quotation omitted). Thus, we find that the prosecutor's comments during his summation regarding the two vehicles shown in the videotape were reasonable and fair inferences supported by the evidence at trial and fell within "the boundaries of permissibly forceful advocacy." State v. Marshall, 123 N.J. 1, 161 (1991).

### V.

For the reasons set forth above, we reverse the judgment of the Appellate Division, reinstate defendant's convictions, and remand for consideration of defendant's sentencing arguments.


JUSTICES PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion. JUSTICE LaVECCHIA filed a dissenting opinion, in which CHIEF JUSTICE RABNER and JUSTICE ALBIN join.

State of New Jersey,

Plaintiff-Appellant,

v.

Rasul McNeil-Thomas,

Defendant-Respondent.

JUSTICE LaVECCHIA, dissenting.

Although prosecutors may piece together evidence during summation, they may not create pieces of evidence. In this trial, the assistant prosecutor crossed that line when he, in effect, testified during closing argument about vital "evidence" that no witness had presented.

This appeal involves a tragic and horrific murder. The key question for the jury was whether defendant committed it. According to the State's theory, defendant retaliated for a fight earlier in the day by shooting at his assailants in a restaurant while driving by in a carjacked silver Malibu. Beforehand, defendant allegedly scouted out the restaurant while driving a black Cadillac CTS, the same car a neighbor supposedly saw him drive earlier near his home. Critical to the State's theory was the need to link a black Cadillac CTS to the drive-by shooting and to defendant.

1

The State introduced grainy surveillance videos taken at night in the vicinity of the restaurant.  They depicted cars passing by the area before and around the time of the shooting.  In closing argument, the prosecutor declared -- no fewer than six times -- that the video depicted a black Cadillac CTS passing the restaurant before the shooting.  No witness, however, testified to that key fact.  The neighbor testified that she had seen defendant drive a black, four-door car that looked like a Cadillac.  She could not and did not identify it as a CTS.  She was not asked whether any cars depicted in any videos matched what she had seen.  Nor did the State call a qualified lay or expert witness who might have offered testimony about the model of the cars in the short, grainy video clips.  Defense counsel, of course, could have challenged such testimony on cross-examination.

Rather than present evidence, the prosecutor provided the link himself. He did not suggest it was reasonable for jurors to infer what type of car appeared in the videos.  Instead, he told the jury what it was -- a "Cadillac CTS" -- time after time.  Compounding that error, he also miscast the neighbor's account of events and said she testified defendant "got into a black Cadillac CTS."

2

The key link, tying a black Cadillac CTS both to the shooting and to defendant, first surfaced in closing argument in the form of testimony from the prosecutor. Because I cannot conclude that the error was harmless, I respectfully dissent.

## I.

For prosecutorial misconduct to require reversal, the prosecutor's conduct must "deprive[] the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999) (citing State v. Ramseur, 106 N.J. 123, 322 (1987)). Insuring "that the jury's impartial deliberations are based solely on the evidence" is an essential aspect to the guarantee of a fair trial in a criminal case. State v. Purnell, 126 N.J. 518, 531 (1992) (citing State v. Simon, 79 N.J. 191, 206 (1979)). Accordingly, a prosecutor must limit summation comment to "facts shown by or reasonably to be inferred from the evidence." State v. Carter, 91 N.J. 86, 125 (1982) (citing State v. Farrell, 61 N.J. 99, 102 (1972); State v. Johnson, 31 N.J. 489 (1960); State v. Bogen, 13 N.J. 137 (1953)).

The prosecutor's obligation in that regard is as primary as that of the court superintending the trial because, when seeking a conviction, a prosecutor bears a dual obligation to see that the trial is fair and the resultant conviction is just. State v. Smith, 212 N.J. 365, 402-03 (2012). Although adversarial, our

3

system of criminal justice does not tolerate convictions achieved by improper methods and, thus, when summing up the State's basis for asking a jury to convict a defendant, a prosecutor is obliged to confine summation remarks to the evidence in the case and only those reasonable inferences that may be drawn from that evidence.  See State v. Bradshaw, 195 N.J. 493, 510 (2008).

## II.

### A.

As the majority opinion explains, the charges against defendant arise from a carjacking and a drive-by shooting into a restaurant in Newark. According to the State's theory of the case, in retaliation for a fight earlier that night, defendant first cased the restaurant by driving by it; he then stole a car, a silver Malibu, and used the Malibu to conduct a drive-by shooting at a local chicken restaurant where the assailants from the earlier fight were eating. Several people were injured, and an off-duty police officer, who was a patron in the restaurant, tragically was killed.

A neighbor and witness to the fight, R.S., testified that she saw defendant leave the family's home, after the fight, with his stepfather in his stepfather's blue pickup truck, and then return in separate vehicles.  R.S. explained that defendant's stepfather returned in the pickup truck and

4

defendant returned in a black vehicle that looked like a newer model Cadillac. In response to questioning she said, "I'm not sure if that's like the CTS, but it wasn't the boxy one, it was like the round -- the one after that." She could not identify the black car as a Cadillac CTS. When asked to further describe the car she could only add, "[t]he four-door."[1] R.S. testified that she saw the blue pickup truck leave again, this time followed by the black vehicle. According to R.S., defendant's stepfather returned in his pickup truck alone. R.S. did not see defendant return after that, but did notice the black vehicle parked in front of defendant's house some time later.

At trial, R.S. was shown still photographs of the blue truck (not taken from the video footage), which she identified as the vehicle defendant's stepfather drove from the home. R.S. was not asked to identify a picture of the black vehicle or to identify any of the vehicles depicted in any of the disputed surveillance videos used during the trial. No one was asked to do so, ever, in this trial.

The record does reveal that the State asked the federal Secret Service to try to identify the license plate on the rear of the pickup truck depicted in the

---

[1] When the prosecutor refreshed R.S.'s recollection with her prior statement, she stated that she called it a "black caddy because that's what it looked like to me."

5

grainy video footage, but an identification could not be made. The record further reveals that the State did not request either the Secret Service -- or any other lay or expert witness -- to provide any other form of identification of either of the two vehicles highlighted from the video played during the prosecutor's remarks. Neither did the prosecutor have a witness further describe a "Cadillac CTS" beyond R.S.'s description that it is black, four-door, and rounded.

B.

During the trial, the State used various security camera footage feeds from outside the restaurant and several establishments in the area. By way of background, the State's first trial witnesses testified that the videos depicted views from the surveillance cameras of three different establishments: the Texas Fried Chicken & Pizza restaurant, Bobby's (a nearby restaurant), and the Oasis Bar. Initially, defense counsel interposed an objection and the following exchange occurred at sidebar:

> [Defense Counsel]: I definitely don't have any objections, I think, to any of the portions they are going to play, but I do want to reserve, just for later, whether every single thing should go in, you know, from -- you know, from like an hour before. You know what I'm saying? The video itself contains a lot of material.
>
> . . . .

6

Obviously, everything played before the jury in the courtroom is in evidence, but we can talk about the scope later. There might not be any problems.

THE COURT: You can't unring the bell. I don't know what's on the video.

[Defense Counsel]: I know what sections they are going to play, I believe. Right?

[Prosecutor]: It goes on, you can see the people shot. You can see when they entered. You can see the victim enter and you can see the victim fall. You can see the police and you can see the ambulance.

THE COURT: Once you show it to the jury, obviously, you showed it to the jury.

[Defense Counsel]: I don't have a problem with any of that, if you want to move it into evidence.

[Prosecutor]: I want to show him camera by camera.

[Defense Counsel]: In order for you to show anything, you have to move it in evidence. I have no objection, with the caveat we discussed.

THE COURT: As long as you don't have a problem, I don't have a problem.

[Prosecutor]: Okay. V-1.

(Sidebar discussion is concluded.)

THE COURT: V-1 in evidence subject to sidebar.[2]

(Exhibit SV-1, Surveillance Video, marked in evidence.)

Immediately following the discussion, the prosecutor played portions of video from each of the restaurant's sixteen security cameras for the restaurant's manager so he could authenticate the footage.

The owner of the nearby restaurant, Bobby's, was called to authenticate surveillance video from six cameras from his establishment, which was offered into evidence as SV-2. One of the cameras purportedly showed "Lyons Avenue and the cars passing in front of [his restaurant]." Defense counsel stated "Judge, again, no objection." The judge asked, "Subject to the issue we spoke of before?" to which counsel responded "Yes." Then, the owner of the

---

[2] To perform its review function in this setting, an appellate court should have the benefit of a record that precisely reveals the evidence admitted at trial as well as clear and timely rulings by the trial court on counsels' objections while the record is developed. Not only do counsel have the obligation to state specifically the grounds of their objections and trial motions in accordance with <u>Rule</u> 1:7-2, but the court, particularly in ruling on motions, is obliged to state timely its reasons "so that counsel and an appellate tribunal may be fully informed." <u>McCann v. Biss</u>, 65 N.J. 301, 304 n.2 (1974).

A record developed with precision advances confidence and eases the appellate review function. This record is not a model for that ideal. That said, I agree with the majority that this sidebar exchange does not constitute a preserved defense objection to the admission of the evidence. <u>Ante</u> at ___ (slip op. at 20).

Oasis Bar authenticated security footage from his establishment. That video, marked as SV-2, was on the same disk as the security footage from Bobby's.

During the testimony of investigating officer Detective Holt Walker, the prosecutor played security footage showing the street outside of the Texas Fried Chicken restaurant, including the car during the shooting. The prosecutor then asked that the jury be shown the portion of the video "that shows the cars." The prosecutor had Detective Walker describe the view of the camera, including the direction it faced, naming the streets in view, and identifying the Texas Fried Chicken in the frame. Then, the prosecutor had the tape fast forwarded "to maybe a minute before where the shooting starts happening."

Detective Walker never mentioned the presence of a blue pickup truck or a black Cadillac CTS while describing the video clip from the Texas Fried Chicken restaurant. Nor was he asked about any such vehicles when viewing any other portions of that video. Again, no witness was asked, ever, to identify any of the vehicles depicted in any of the videos. The prosecutor also showed Detective Walker footage from a camera from Bobby's. Again, Detective Walker never mentioned the pickup truck or black Cadillac.

9

Importantly, the only witness who testified to seeing a blue pickup in front of defendant's home and a black car -- R.S. -- was never asked to identify a picture of the black vehicle that she saw outside defendant's home. R.S. also was never asked to view the videos depicting the cars. However, she was selectively shown a portion of the video from the Texas Fried Chicken restaurant and asked to identify people entering the restaurant as those involved in the earlier fight.

Close examination of this record reveals plainly that R.S. never identified the model of the "black car" in which she viewed defendant leaving the vicinity of his home other than to say she believed it to be a "Cadillac" make, a "newer" model, rounded, not boxy. The State could not dispute this point at oral argument before our Court. R.S. could not identify the model, despite the prosecutor's questioning whether she thought it was a Cadillac CTS model. She never even used the word "sedan." She certainly never identified the black car on the videos as a Cadillac CTS. Nor did she testify the black car on the video was the same car -- or looked similar to the "black car" -- she saw outside defendant's home earlier in the evening. None of that happened because the State did not show the video of the cars to the only witness who said she saw a black car and offered a limited description of what it looked

10

like. Without any witness testimony linking the cars, the State argues it is a reasonable inference that a car described only as black, four-door, rounded, and a Cadillac was both a Cadillac CTS, and the same car depicted in a grainy video. But that is not the summation the State presented.

C.

During summations, the prosecutor asserted that defendant and his accomplice stole the silver Malibu, drove down the street, and fired shots into the Texas Fried Chicken restaurant. After discussing the witness testimony, the prosecutor played portions of the restaurant's surveillance video highlighting the presence of the Malibu.

Then, for nine pages of the thirty-page transcript of the State's summation, the prosecutor did the following. He showed part of the restaurant's security footage, during which he definitively identified two cars in the footage as a "Cadillac CTS" and "a 1993 blue Ford pickup truck." Next, he played the security footage from Bobby's and declared that the video showed the same pickup truck and Cadillac. Last, the prosecutor showed the security footage from Oasis Bar and declared that the video showed the Cadillac:

> [Prosecutor]:    Cadillac CTS. Cadillac CTS, black Cadillac CTS.

You know what the beauty of the deliberative process is, ladies and gentlemen?  We're picking a jury in this courtroom and we're asking people questions at sidebar.  "Tell us about yourself."  Some of you say, "I like walking in the woods."  "I like nature trails."  I like this and that.  Between the 14 of y'all, somebody knows what a Cadillac CTS looks like.  Somebody knows what the outline of a Cadillac CTS looks like.

. . . .

That is a black Cadillac CTS.

. . . .

[Prosecutor]:  Cadillac CTS.  It's a lot easier to view and identify the Cadillac CTS from the Bobby's video.

Cadillac CTS, pickup truck.

[R.S.] said she saw [defendant's stepfather] leaving in that pickup truck and the defendant was in this car.  It was about three and a half minutes before the shooting.

. . . .

[Prosecutor]:  Cadillac CTS.  Move it up a little bit.

Cadillac CTS.  You can't see the whole thing.  You can't see the license plate.  You can't see the defendant driving in there.  But [R.S.], that's what she testified about.  The most neutral witness in this case.

[(emphases added).]

12

None of that evidence was highlighted or even mentioned during the State's opening, or by any witness, as previously described. None of the identifications the prosecutor made in the video had been made by any witness. The jury did not have a photo of defendant's black car, or a generic photo of a Cadillac CTS, to which they could compare the car in the video. Nevertheless, as the transcript reveals, the prosecutor made repetitive declarative statements during his summation that the video depicted "the Cadillac CTS" or "the CTS" and the "1993 blue Ford pickup truck" attributed to defendant and his stepfather, respectively. That would have been powerful evidence if offered by a witness and tested under cross-examination because it would have placed defendant in close temporal proximity to the scene of the shooting that took place minutes later and provided strong evidence that defendant was guilty of the carjacking. Without a witness, the prosecutor simply stated a theory as fact.

Following the State's summation, defense counsel made a motion for a mistrial alleging that

> [t]he Prosecutor just played a piece of tape and testified about it. There was no prior testimony and, in fact, he also misrepresented testimony. So he played a piece of tape where he purported to testify that the blue pickup truck in the tape was the same blue pickup truck that is owned by my client's stepfather. No one had testified

13

in the case that, in fact, the blue pickup truck on that video was my client's stepfather's truck. . . .

Additionally, the Prosecutor testified that a black car -- and that's all I could tell from the video, is that it's a black car -- is a Cadillac CTS. <u>There was no witness in this case who testified that that black car is a Cadillac CTS.</u>

[(emphasis added).]

The court denied the motion, finding that the footage was admitted evidence and the prosecutor's comments were fair comment on the evidence. The court also refused to give a curative instruction regarding the prosecutor's comments about the vehicles and their association with defendant. Instead, the court relied on the standard jury charge that included: "Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think is important in this case, you must rely solely upon your understanding during the trial."

During deliberations, the jury sent a note stating: "We would like to see: The tape before the shooting which shows the blue truck and the black car. It was only shown by the Prosecutor at the closing statement. Can/may we see this again? Can it count as evidence?" Over defense counsel's objection, the

14

judge determined the videos were in evidence and could be viewed again and considered as evidence.

Before the videos were played for the jury, defense counsel reiterated the objection that the videos were not in evidence. The judge noted the objection, and the videos were played for the jury.

The jury acquitted defendant on the murder charge but found him guilty of conspiracy to commit carjacking, carjacking, conspiracy to commit murder, aggravated manslaughter, unlawful possession of a handgun, possession of a firearm with a purpose to use it unlawfully, three counts of attempted murder, and various aggravated assaults. The court sentenced defendant, in the aggregate, to two consecutive terms of thirty years of imprisonment with an eighty-five percent parole disqualifier under the No Early Release Act.

### III.

In my view, the prosecutor's remarks crossed the line from fair comment on the evidence in the record into impermissible territory. First, the comments inserted information not in the record, by referring to the truck in the videos as "the 1993 blue Ford pickup," and repeatedly calling the black car the "CTS" when no one had identified the black car outside defendant's home in that specific a manner. See State v. Feaster, 156 N.J. 1, 56, 61-62 (1998) (noting

15

that the prosecution may not "provide . . . missing pieces" of evidence). And, no one identified the black car in the grainy videos as a Cadillac CTS. We do not know if any of the witnesses at trial could have done so; all we know is that no witness was asked to make an identification, and none did. The record does not reveal the reason that question was never asked.

Worse, the prosecutor actually miscast R.S.'s testimony when he summarized it during summation. While showing the video to the jury, the prosecutor stated,

> [R.S.] says cars were coming and going, the defendant left three times. The first time he left in the pickup truck with his stepfather. The second time -- I can't remember exactly what she said, but the third time she said he got into a black Cadillac CTS and the black Cadillac CTS followed the pickup truck.

With respect to that black car depicted in the video, the prosecutor repeatedly declared that it was a Cadillac CTS. Aside from the prosecutor miscasting evidence in the record, the jury could have perceived that he knew something they did not. That is impermissible. See Frost, 158 N.J. at 85 (finding reversible error where a prosecutor's comments referenced police reports not introduced into evidence that bolstered the credibility of an officer-witness). Prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." Berger v. United States, 295

U.S. 78, 88 (1935). "[I]mproper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Ibid.

Second, to the extent that the State urges us to view the comments not as declarative statements but rather as suggestions for the members of the jury to draw their own deductions or inferences from the videos, I do not believe that the lay persons of the jury would know that the grainy, short snippets in the videos depicted a Cadillac CTS. It is too much to constitute a fair inference because it required prior knowledge, something that the State's case did not provide to the jury through any lay or expert testimony commenting on what the videos depicted with respect to the black car. The prosecutor noted as much when he claimed that "[s]omebody knows what the outline of a Cadillac CTS looks like."

## IV.

Trials involve a careful, factually supported balancing of different interests. For me, the institutional interests in a conviction achieved through a fair trial should align with the individual's interest in a fair trial. That did not happen here.

In my view, the prosecutor's summation transgressed permissible lines expected of the State in the effort to secure a conviction. In this case, the prosecutor gave testimony rather than related testimony in summation. Worse, the manner and timing of this discussion of evidence -- which had not been addressed at all before in the State's case -- had the effect of ambushing defendant. By not raising the point sought to be gleaned from the videos until summation, the State prevented defendant from any opportunity to rebut the "evidence."

It is certainly permissible for the State to highlight particular evidence during summation. For example, the State could take words from a single document out of hundreds admitted in evidence in bulk and present the key language in large type on a poster board or a power point presentation to the jury. But the difference is that the document is clear-cut, easily perceived evidence. This grainy surveillance video is not of the same ilk. It required translation or narration, not previously testified to by any witness, for the jury to perceive what the prosecutor declared the video depicted.

Moreover, the prosecutorial error was impactful.

A key strand of the State's case was that whoever committed the carjacking also committed the shooting. The shooting occurred shortly after

18

the carjacking; the videotape depicts a gun shooting from a car that resembled the carjacked vehicle as it passes the restaurant; shots were heard by the carjacked victims shortly after the carjacked vehicle sped away; and spent shells matching the bullets used in the shooting were found in the recovered vehicle. Implicating defendant in the carjacking was a necessary part of the prosecution's case.

The video segments shown to the jury during the closing and the prosecutor's comments regarding those videos were important to connect defendant to the carjacking. The prosecutor alleged that the video demonstrates that defendant was only a few blocks away minutes before the carjacking occurred. The black car that the prosecutor declared was a "Cadillac CTS" is shown turning down a street leading to the location of the carjacking. The summation purported to show, on video, defendant on his way to commit the carjacking within minutes of the commission of that crime.

The carjacking victim was unable to identify defendant immediately after the incident. The victim identified defendant only when police showed her his photo for a second time. That identification, and the video shown during summation, were two of the most important pieces of evidence connecting defendant to the carjacking. The remaining evidence at trial

suggested that whoever committed the carjacking almost certainly committed the shooting.

Without the prosecutor's testimony regarding the video during summation, I am not convinced, beyond a reasonable doubt, that the outcome of the trial would have been the same. This evidence and how it unfolded in the State's final remarks to the jury, which the defense had no opportunity to rebut, placed defendant in close temporal proximity to the shooting, bolstered the State's theory of motive, and, critically, connected defendant to the carjacking. The error was not harmless in my estimation.

Accordingly, I disagree with my colleagues in the majority and respectfully dissent. I would affirm the Appellate Division's reversal of this conviction and remand for a new trial.