**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0185-18T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DASHAWN L. MIXSON,

    Defendant-Appellant.

_____

> Submitted October 20, 2020 – Decided December 17, 2020
>
> Before Judges Gilson and Moynihan.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 17-06-0399.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Francis W. Yook, Designated Counsel, on the brief).
>
> Gurbir S. Grewal, Attorney General, attorney for respondent (Steven A. Yomtov, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Found guilty by jury of all crimes for which he was indicted, defendant Dashawn L. Mixson appeals from his convictions and concomitant aggregate fifty-year sentence for first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); conspiracy to commit first-degree murder, N.J.S.A. 2C:5-2(a)(1) and (2); N.J.S.A. 2C:11-3(a)(1) and (2) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count three); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) (count four),[1] in connection with the shooting death of Dajour Riley.  In his merits brief, he argues:

> POINT I
>
> THE STATE'S IMPROPER REMARKS IN OPENING AND SUMMATION CONSTITUTED PROSECUTORIAL MISCONDUCT AND DEPRIVED [DEFENDANT] OF A FAIR TRIAL.
>
> > A.   The State's Summation was Replete with Improper Appeals to Emotion that Impassioned the Jury.
> >
> > B.   The State's Opening Improperly Vouched for the Credibility of Witnesses.

---

[1]  After merging counts two and three into count one, the trial court imposed a fifty-year prison term on count one, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and a concurrent eight-year term with four years of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), on count four.

POINT II

THE STATE'S RELIANCE ON INHERENTLY UNRELIABLE JAILHOUSE SNITCH TESTIMONY AT TRIAL VIOLATED DEFENDANT'S DUE PROCESS RIGHTS UNDER THE NEW JERSEY CONSTITUTION AND THE COURT FAILED TO PROPERLY INSTRUCT THE JURY ON HOW TO EVALUATE SUCH TESTIMONY.

POINT III

[DEFENDANT'S] SENTENCE IS EXCESSIVE, THE RESULT OF A DEFICIENT SENTENCING PROCEDURE, AND IN CONTRAVENTION TO THE SENTENCING GUIDELINES.

    A.    [Defendant's] Sentence Was the Product of Erroneous Fact-Finding.

    B.    The [Trial] Court Failed to Consider or Apply Mitigating Factors Three and Eight.

    C.    The [Trial] Court Misapplied Aggravating Factor Three.

Unpersuaded, we affirm.

According to the trial evidence, on the morning of March 28, 2017, defendant, his codefendant Varnell Mohammed and a third individual got into Mohammed's girlfriend's vehicle and went to "get some weed." The third individual had a gun on his person but put it under the hood of the car because Mohammed did not want it inside the car "in case the cops pulled [them] over."

After obtaining the "weed" they proceeded "to the doctor's office on Union and Garfield" "to see if [Mohammed's] daughter had a doctor's appointment." Once they arrived, Mohammed "got out of the car," went inside the office, and asked the security desk "something." He got back in the car, which was parked in the parking lot, and waited for his girlfriend to arrive with his daughter.

That same morning, Dajour Riley and his girlfriend, Tiera Harris, who was four months pregnant, were also at the same office for a doctor's appointment. While Mohammed and defendant were waiting in the parking lot, defendant noticed Riley's car.

Mohammed testified, they "had beef with" Riley, believing "he had something to do with" Tyron Wilson—Mohammed's cousin and defendant's friend—"being dead." As Mohammed was driving out of the lot, defendant saw Riley and his girlfriend walk out of the doctor's office and get in their car. Defendant "told [Mohammed] to pull over so he could grab the gun and shoot at them." After Mohammed complied, Riley drove out of the parking lot, made two turns and suddenly pulled the car over. Defendant walked up to the driver's side of Riley's car and opened fire, shooting at least four shots.

As the shots were being fired into their vehicle, Riley jumped over and covered Harris in the passenger seat. She could feel his body jump as he was

hit by the bullets. When the shooting finally stopped, Harris got out of the car and pulled Riley into the passenger seat so she could drive him to the hospital. Before she drove off, she saw a vehicle she recognized but could not see inside the tinted windows. Despite treatment at the hospital, Riley ultimately succumbed to his injuries from three gunshot wounds.

Harris gave a statement to police while at the hospital describing the car she recognized at the scene and identifying Mohammed who she believed to be its owner. The police, who were familiar with Mohammed and the vehicle from an incident just a few weeks prior and knew he frequented a particular housing complex, "began canvassing that area and the surrounding area in hopes of finding the vehicle and . . . Mohammed." In fact, after Mohammed had dropped defendant at his residence after the shooting, he and the third individual went to that housing complex and parked the car. Soon after their arrival, the police located the vehicle and Mohammed. He was placed under arrest.

Mohammed gave a statement to police implicating defendant as the shooter. He would not, however, provide an accurate location where he dropped defendant after the incident. He was charged with conspiracy, homicide, and unlawful possession of a weapon. Mohammed pleaded guilty to conspiracy to

5

commit aggravated assault and agreed, as part of the plea, to provide "truthful testimony" at defendant's trial.

Prior to the March 28 shooting, defendant began posting remarks on Facebook. Twenty-five days prior, he posted: "he riding around trying to find [people]"; "[t]hey kill his man in December"; and "I'm going to look until I find him." Thirteen days prior, defendant posted that someone[2] "is a dead[] man." After the shooting, defendant continued to post, stating "I know you know we live" and "fuck the ops." Two days after the shooting, he posted "I know you all know," then "[m]y daycare business ain't over yet," then "you all laughing like if I'm locked up," and, lastly, updated his cover photo with a picture of Tyron Wilson. Defendant turned himself in to the police on March 30, 2017.

I.

Defendant first avers the assistant prosecutor's opening and closing remarks to the jury deprived him of a fair trial. Specifically, he contends the verdict was tainted because the jury was "substantially impassioned" by the assistant prosecutor's "numerous, inflammatory remarks" about: Riley's girlfriend's pregnancy; Riley's mother; Riley's condition after being treated at the hospital; the shooting; and defendant's surrender to police.

---

[2] The court reporter at trial transcribed that person as "indiscernible."

Although prosecutors are "expected to make vigorous and forceful closing arguments to juries[,]" and "are afforded considerable leeway in [their] closing arguments," State v. Frost, 158 N.J. 76, 82 (1999), a prosecutor

> must confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence. . . . [I]f a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, "by way of comment, denunciation or appeal, will afford no ground for reversal."
>
> [State v. Smith, 167 N.J. 158, 178 (2001) (quoting State v. Johnson (Johnson I), 31 N.J. 489, 510 (1960)).]

In determining whether the assistant prosecutor's closing remarks violated those tenets, the factors we consider include whether: "timely and proper objections were raised, . . . the offending remarks were withdrawn promptly, . . . the trial court struck the remarks and provided appropriate instructions to the jury . . . [and] the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012) (internal quotation marks and citations omitted). Our analysis of these factors leads us to conclude the assistant prosecutor's closing remarks, as a whole and in context, while not completely harmless, were not "sufficient to raise a reasonable doubt as to whether [they] led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

7

Defendant did not object to any of the remarks he now challenges, depriving the trial court of an opportunity to correct any prosecutorial overstep. State v. Wilson, 57 N.J. 39, 50-51 (1970). That reticence also signaled that "the defense did not believe that the prosecutor's remarks were prejudicial." Id. at 51. In any case, we perceive little prejudice.

As defendant points out in his merits brief, the assistant prosecutor alluded to Harris's pregnancy a number of times. The first reference recounted Harris's testimony that Riley covered her as the bullets hit his body, describing "some of the final moments that she spent with the father of her child." That reference, made to highlight defendant's mental state when he fired the shots into the car, was also reprised later in the State's summation when the assistant prosecutor argued:

> defendant showed no remorse when he shot Dajour Riley in front of [Harris]. He shot Dajour Riley as he was in the car with his pregnant girlfriend. There was no mercy shown that day. No remorse shown that day. Hours after the defendant did this, he posted a photo to Facebook and he commented saying we live. He was celebrating. He was celebrating the fact that he took a man's life. Celebrating the fact that he killed that man in front of his pregnant girlfriend.

The assistant prosecutor repeated it again when he described the "barrage of bullets [that] hit Dajour Riley in [the] chest and twice in the shoulder, as he was

8

covering and protecting his pregnant girlfriend." He also said the victim "had no idea" that defendant was planning to shoot him while he "was in the doctor's office with his pregnant girlfriend."

Those remarks were based on the evidence that was adduced at trial and related Riley's location prior to the shooting and the reason—unrelated to the shooting—he was there, his actions when he was shot, and defendant's callousness as he shot into the car, evidencing the mental state the prosecution was required to prove: purposeful or knowing murder. In context, the assistant prosecutor stayed within the evidence and the reasonable inferences the jury could draw therefrom, thus presenting "no ground for reversal." Johnson I, 31 N.J. at 510; see also State v. Bradshaw, 195 N.J. 493, 510 (2008).

We do agree with defendant that the assistant prosecutor exceeded the bounds of propriety by telling the jury:

> On that fateful rainy morning, Dejour Riley was expecting to be a father. He wasn't expecting a barrage of bullets as he left that doctor's office with his girlfriend. And while he was expecting to be a father at [nineteen years-old], he was still a child himself. He was a son to a mother who will never get to spend another Mother's Day with her baby. Dajour Riley will never get to meet the son that was named after him. That is who Dajour Riley was on March 28[], 2017. That is the man who lost his life.

"Where the victim's character and future plans have no bearing on the substantive issue of guilt, the prosecutor may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury." State v. Darrian, 255 N.J. Super. 435, 453 (App. Div. 1992). But, "not every deviation from perfection on the part of a prosecutor warrants a reversal of a conviction." Ibid. These grouped remarks were isolated in a summation that otherwise conformed to the prosecutor's duty to "play fair." See State v. Marks, 201 N.J. Super. 514, 535 (App. Div. 1985). Again, the remarks did not draw an objection, and we perceive "they were not so egregious" to sway the jury and "deprive[] defendant of a fair trial." Smith, 212 N.J. at 404.

We find defendant's challenges to the other portions of the State's summation less compelling. The assistant prosecutor's descriptions of the victim in the hospital and the shooting were fair comments on the evidence. See Bradshaw, 195 N.J. at 510.

The depiction of Riley—"with medical equipment hooked up to his body[;] [a] tube down his throat[;] [t]ubes in his chest draining fluid"—was, as the assistant prosecutor told the jury, related to the State's proofs that the victim suffered serious bodily injury that resulted in death. See N.J.S.A. 2C:11-3(a)(1)

and (2). It also echoed the medical examiner's testimony about the signs of therapy which his external examination of the victim's body revealed:

> at that time there was an endotracheal tube, which is a[n] ET tube in the mouth area, and there was a [twelve]-inch suture, an incision, on the abdomen, which the surgeon performed an operation on the body, and there [were] bilateral chest tubes, which they used for drainage of fluid or blood from the chest cavity. Then there is a blood pressure cuff on the arm and there is [an]other oxygen monitor on the finger. There are IV lines on the forearm, on the wrist and on the leg area, and also there is a Foley's catheter, which is the urine catheter in the bladder.

The assistant prosecutor's comments, therefore, also related to the thoroughness of the autopsy. Evidence in a murder trial is not for the faint of heart. Contrary to defendant's argument, the comments were not unduly "graphic" and "gratuitous."

The same holds true for the State's comments about defendant showing "no mercy" and "no remorse" in connection with the shooting and defendant's subsequent celebratory Facebook posts. The phrases defendant protests: "'waited for his opportunity to strike'; 'barrage of bullets'; 'Riley's executioner'; 'in cold blood'; 'in cold blood' (again); knowing 'what the defendant is capable of'; '[h]ide lying in wait'; 'barrage of bullets' (again)," not only reference the trial evidence, they buttress the State's argument that defendant acted purposely or

11

knowingly in causing Riley's death or serious bodily injury that resulted in death.  They, like the State's comments about the number of shots fired and the nature of the attack, related to defendant's mental state.  The assistant prosecutor was "entitled to sum up the State's case graphically and forcefully," and was not "expected to present the State's case in a manner appropriate to a lecture hall." Johnson I, 31 N.J. at 510-11.

And, the assistant prosecutor's references to defendant turning himself in to police related to the timing of the arguably incriminating postings on defendant's Facebook account.  Furthermore, the assistant prosecutor did not state or imply defendant's surrender evidenced his guilt.

We also reject defendant's argument that the assistant prosecutor vouched for the State's witnesses' credibility in his opening statement.  The assistant prosecutor was outlining what direct evidence the State would proffer at trial when he said "the State's best witness[, the victim,] is dead," and Mohammed was "the next best thing."  See State v. W.L., 292 N.J. Super. 100, 108 (App. Div. 1996) ("The purpose of a prosecutor's opening statement is to present to the jury an outline or summary of what the State expects to prove.").

Defendant contends the assistant prosecutor "suggested that Riley would have been able to identify" defendant.  But, no such inference could reasonably

have been made from the opening remarks. The assistant prosecutor did not suggest what the victim would have disclosed. Nor did the assistant prosecutor offer an opinion about Mohammed's veracity. The assistant prosecutor merely offered that Mohammed's status as a getaway driver and coconspirator, who witnessed defendant shoot Riley, rendered his testimony "direct evidence of the defendant's conduct." That statement was not a comment about Mohammed's credibility, and it certainly was not a personal assurance by the assistant prosecutor that Mohammed was telling the truth.

So too, the assistant prosecutor did not vouch for Mohammed's credibility during his summation. He properly responded to defense counsel's closing which was primarily dedicated to discrediting Mohammed's testimony implicating defendant, during which he repeatedly said Mohammed lied. Prosecutors may "respond to an issue or argument raised by defense counsel." State v. Johnson (Johnson II), 287 N.J. Super. 247, 266 (App. Div. 1996); see also State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991) (holding a prosecutor may respond to the defense's disparagement of the State's case in order to "right the scale" (quoting United States v. Young, 470 U.S. 1, 12-13 (1985))). The assistant prosecutor was careful to argue Mohammed was credible

because evidence—including video and photographic evidence, and defendant's Facebook postings—buttressed his testimony.

Accordingly, we do not perceive the assistant prosecutor's comments denied defendant a fair trial or led to an unjust result so as to require reversal. State v. Roach, 146 N.J. 208, 219 (1996); Marks, 201 N.J. Super at 535-36.

II.

Defendant's arguments that the admission of Mohammed's testimony violated his due process rights because it was inherently unreliable, and that the trial court failed to instruct the jury on the proper method to evaluate that testimony are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). Mohammed was not, as defendant contends, a "jailhouse snitch." That is, he was not, as delineated in the Connecticut model jury charge advocated by defendant in his merits brief as one that should have been given in this case, "[a]n informant . . . who is currently incarcerated or is awaiting trial for some crime other than the crime involved in this case and who obtains information from the defendant regarding the crime in this case and agrees to testify for the state."

Mohammed was an indicted participant; a coconspirator in and eyewitness to defendant's crimes. He, unlike a "jailhouse snitch," was actually present when

the crimes were committed. And his testimony was buttressed by video and photographic evidence as well as defendant's own statements.

Mohammed's status as a cooperating witness was disclosed to defendant, elicited by the State on direct examination, highlighted by defendant on cross-examination, and argued as a credibility factor by defendant in summation. Defendant neither objected to the trial court's jury instruction that properly included the cooperating witness charge, Model Jury Charges (Criminal), "Testimony of a Cooperating Co-defendant or Witness" (rev. Feb. 6, 2006), nor suggested an alternative charge. Thus, Mohammed's testimony was "subject to special scrutiny," see State v. Hernandez, 225 N.J. 451, 468 (2016), and it was left to the jury to evaluate the credibility of that evidence, see State v. Frisby, 174 N.J. 583, 594-95 (2002). We perceive no due process violation in the admission of Mohammed's testimony, State v. Long, 119 N.J. 439, 489 (1990), superseded by statute on other grounds, N.J.S.A. 2C:11-3i, or error, much less plain error, in the trial court's jury charge, State v. Walker, 203 N.J. 73, 89 (2010); see also R. 2:10-2.

### III.

The trial court, finding aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant will reoffend), and nine, N.J.S.A. 2C:44-1(a)(9) (the

need for deterrence) substantially outweighed the non-existent mitigating factors, imposed the aggregate fifty-year sentence subject to NERA's eighty-five percent parole ineligibility period.

Defendant argues his sentence was excessive and the trial court, by failing to apply mitigating factors three, N.J.S.A. 2C:44-1(b)(3) (defendant acted under strong provocation), and eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur), and applying aggravating factor three, though it "was not fully supported by competent[,] credible evidence in the record[,]" abused its discretion by failing to follow the sentencing guidelines, and our Supreme Court's mandate that "a trial court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989).

In reviewing the trial court's sentencing decision, we do not "substitute [our] judgment for that of the trial court." Ibid. We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." Ibid.

16

Though, as defendant contends, the trial court did not address specific mitigating factors, stating only that it "reviewed all of the mitigating factors[; t]here are none[,]" defendant did not raise any mitigating factors at sentencing, including those he now proposes should have been found. Trial courts need to provide "reasons for imposing its sentence that reveal the court's consideration of all applicable mitigating factors in reaching its sentencing decision." State v. Bieniek, 200 N.J. 601, 609 (2010) (emphasis added). Our Supreme Court encouraged trial courts to address "each factor raised," but did not require courts "explicitly reject every mitigating factor argued to the court," much less those that were not argued. Ibid.

Moreover, no competent evidence supports the proposed mitigating factors. In arguing that mitigating factor three is applicable, defendant contends he was provoked by Riley's alleged involvement in the shooting death of Tyron Wilson. Not only is there scant evidence of Riley's involvement in that death, revenge for a shooting that occurred weeks earlier cannot serve as provocation that warrants consideration as a mitigating factor.

Defendant also contends he was entitled to mitigating factor eight because he did not have a violent history and it is unlikely that he would be provoked again given "the unique circumstances pertaining to" Riley's alleged

17

involvement in defendant's friend's death. The trial court, however, in finding aggravating factor three, considered the then-twenty-one-year-old defendant's "involvement in the [c]riminal [j]ustice [s]ystem started in Texas at the age of about [sixteen] with two adjudications [and] four arrests in Texas," including an adjudication for burglary, a criminal trespass that resulted in "a supervisory caution," and an adjudication without disposition for evading arrest. The court also found "a lengthy history of involvement in substance abuse starting at the age of [fourteen]," that continued with "a little celebration" with the "use of alcohol, marijuana and Percocet because he knew he would be turning himself in" to the police on these charges following defendant's celebration of Riley's murder. And the court noted defendant's New Jersey criminal history included an indictable conviction, with separate arrests for possession of drugs and "a drug paraphernalia charge," as well as "a pending criminal trespass" in municipal court when he was charged with this murder. The trial court based the aggravating factor on that history as well as defendant's conduct in connection with the murder which the court described as "nothing short of a planned out execution" that was not the product of "an argument and . . . a quick decision." The trial court concluded that conduct and defendant's criminal

history and "repeated" drug use "indicate[d] . . . a strong risk he will commit another offense."

As we noted in State v. Towey, 244 N.J. Super. 582, 593 (App. Div. 1990), aggravating factor three and mitigating factor eight are related. The trial court's supported finding of aggravating factor three militates against mitigating factor eight. Cf. O'Donnell, 117 N.J. at 216 (finding the defendant's "almost boastful" attitude towards his offense evidenced a belief that defendant could "take the law into his own hands," thus supporting the trial court's finding that the defendant was likely to commit future offenses). In that neither of the proposed mitigating factors are supported by competent evidence, a remand is not warranted. Bieniek, 200 N.J. at 608-09 (holding "a remand may be required when a reviewing court determines that a sentencing court failed to find mitigating factors that clearly were supported by the record").

Our determination that aggravating factor three is supported by the record leads us to conclude the trial court did not abuse its discretion in imposing sentence. See State v. Roth, 95 N.J. 334, 363-64 (1984). The trial court followed the sentencing guidelines, based its findings as to aggravating and mitigating factors on competent, credible evidence, and the application of the

guidelines to the facts of this murder does not render the sentence imposed clearly unreasonable so as to shock the judicial conscience. Id. at 364-65.

To the extent not addressed herein, we determine the remainder of defendant's arguments, including that the sentence was based on the court's misstatement of facts regarding defendant's possession of the firearm when he first entered Mohammed's vehicle—mentioned by the trial court after determining the length of the sentence in connection with its ultimate determination that the possession of that gun should run concurrent to the murder sentence—are without sufficient merit to warrant discussion. R. 2:11-3(e)(2). If error, that misstatement did not prejudice defendant.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0185-18T4